AMOS CASTNER *et al.*

*v.*

JAMES WALROD.

1. LACHES—*as a defense in equity.* Where a party, with full knowledge of all the facts, sleeps upon his rights for nineteen years without asserting his equities, and no sufficient excuse is shown for the delay, his *laches* will be such as to present a bar to relief in a court of equity. A court of equity will not enforce a stale demand.

2. LIMITATION—*in equity.* In the absence of a statute of limitations, the time in which a party will be barred from relief in a court of equity depends, to a certain extent, upon the facts of the particular case; but when the statute has fixed the period of limitation barring the claim at law, courts of equity, by analogy, will follow the limitation provided by law. A court of equity will often treat a less period of time as a presumptive bar to a recovery.

3. Where a party procured a bond for a deed, and assigned the same through his son for money with which to make a payment, and died, and the assignee completed the payments, taking a conveyance to himself, and went into possession of the land, and made valuable improvements thereon, and paid all taxes for a period of nineteen years, residing upon the premises, it was *held*, that the heirs of the original purchaser, having knowledge of the facts, were not entitled to relief in equity as against such grantee, on account of their long acquiescence and delay.

4. SAME—*as against married woman.* Since the passage of the Married Woman's Act of 1861, the Statute of Limitations runs against a married woman the same as against a *feme sole.*

5. FORMER DECISION. The expression in *Morrison* v. *Norman,* 47 Ill. 477, and *Noble* v. *McFarland,* 51 ib. 226, to the effect that the Married Woman's Act of 1861 has no effect upon the saving clause in the limitation laws, is overruled.

6. STATUTE—*construction.* Courts are not confined to the literal meaning of words in a statute, in its construction, but the intention may be collected from the necessity or cause of the act, and its words may be enlarged or restricted according to its true intent.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. THEODORE D. MURPHY, Judge, presiding.

Messrs. WHEATON, SMITH & McDOLE, for the plaintiffs in error.

Mr. J. H. MAYBORNE, for the defendant in error.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by plaintiffs in error in the circuit court of Kane county, against James Walrod, to enforce the conveyance of a certain tract of land, the equitable title of which, it is claimed, belongs to them.

The defendant, James Walrod, put in an answer to the bill and, replication having been filed, a hearing was had up pleadings and proofs, and the court entered a decree dis ing the bill. The complainants bring the record here, urge as a ground of reversal that the court erred in dismiss the bill upon the evidence contained in the record.

It appears, from the evidence preserved in the record, t on the 27th day of October, 1849, Amos Haskins, the fat

of the complainants, purchased the land in controversy of one
Owen Hall, for the sum of $140, payable, $50 on the 1st day
of October, 1850, $50 in two and $40 in three years from the
date of purchase, with six per cent interest thereon.   Haskins
gave his promissory notes for the purchase money, and received
of Hall a bond, providing for a conveyance of the land upon
the payment of the notes.   Haskins went into possession of
the land under his purchase, and made slight improvements
thereon.   In the summer of 1850, he lost the bond for a deed,
which was subsequently found by his son, Asa Haskins, who
is one of the complainants in the bill.   On the 16th day of
October, 1850, Asa Haskins obtained of the defendant $35 or
$40 for one month, and assigned the bond, in the name of his
father, as security for the money.   Asa Haskins testified that
the money thus obtained of the defendant was used, in con-
nection with other money which he had, to pay the first fifty
dollar note, and the interest on the other notes given for the
land.

On the 4th day of November, 1850, Amos Haskins died.
The money which had been loaned of defendant not having
been paid, on the 19th day of November, 1850, the defendant
presented the bond to Hall, and called for a deed as assignee
of Amos Haskins, and upon the payment of the deferred pay-.
ments, one of $50 and the other of $40, Hall, on that date,
executed and delivered to the defendant a deed for the prem-
ises, which was, on the day it was executed, placed upon record.
Immediately after receiving the deed, James Walrod took
possession of the premises thereunder, and has remained
in possession ever since, made valuable improvements, and
paid all taxes assessed thereon.   After Walrod had obtained
the deed of Hall, he made an effort to settle with the widow
and heirs, and obtain a conveyance from them.   In this, how-
ever, he failed, except as to the widow and Asa, who, upon a
certain consideration paid them, executed an instrument, in
writing, on the 20th day of December, 1850, conveying their
interest in the premises to him.

No legal proceedings of any character were instituted by

the complainants to obtain their rights in the premises, although they were fully informed of the manner in which the defendant acquired the title, until the filing of this bill, on the 20th day of January, 1869.

While the facts disclosed by the record might have warranted a court of equity, had the complainants invoked the aid of the court in apt time, in decreeing the relief prayed for in the bill, yet where the complainants, with a full knowledge of all the facts in their possession, have slept upon their rights for a period of nineteen years, and have failed to give any satisfactory reason for the delay, and have permitted the defendant to improve and develop the property until it has become valuable, the case is presented in entirely a different aspect.

The principle that must control a case of this character has been clearly stated by Lord CAMDEN, in *Smith* v. *Clay*, 3 Brown's Chancery Reports, in these words: "That a court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights for a great length of time. Nothing can call this court into activity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing. *Laches* and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court."

The principle announced in the case cited has been so long sanctioned and upheld both in the courts of England and this country, and the doctrine that courts of equity will not lend their aid to enforce stale demands so well understood and so well established, that the citation of authorities to sustain the question would seem to be unnecessary. The question has, however, frequently arisen in this court, and the decisions are uniform. *Beach* v. *Shaw*, 57 Ill. 25; *Rogers* v. *Simons.* 55 Ill. 76; *Winchell* v. *Edwards*, 57 Ill. 45; *Carpenter* v. *Carpenter*, 70 Ill, 457.

In the absence of the existence of a statute of limitations, the time in which a party will be barred from relief in a court

of equity must necessarily depend, to a certain extent, upon the facts of each case, as it may arise; but when the statute has fixed the period of limitation under which the claim, if interposed in a court of law, would be barred, courts of equity, by analogy, follow the limitation provided by law. This is fully established in *Kane County* v. *Herrington*, 50 Ill. 239, where it is said: "Where the Statute of Limitations would bar an action at law, and the matter is litigated in chancery, the latter tribunal, following the analogies of the law in such cases, would hold the claim to be stale, and refuse the relief sought." To the same effect are Angell on Limitations, sec. 467, and *Chalmondeley* v. *Clinton*, 2 Jac. & Wal. 141.

A court of equity will, however, often treat a lapse of a less period than that provided in actions at law as a presumptive bar, on the ground of discouraging stale claims, or gross *laches* or unexplained acquiescence in the assertion of an adverse right. 2 Story Eq. Jur. sec. 1520.

An application of these principles to the facts disclosed by the record, would seem to leave no room to doubt the correctness of the decree rendered by the circuit court.

The record discloses that the defendant, on the 19th day of November, 1850, obtained a deed of the land in controversy of Owen Hall, who, it is conceded, held the legal title, deducible of record from the State or the United States. The deed was placed upon record, the defendant moved upon the land, and from that time to the filing of the bill he resided upon and held the actual possession of the entire tract as a residence. Under the limitation laws of the State, known as the act of 1835, possession by actual residence under a connected title, in law or equity, deducible of record from this State or the United States, for a period of seven years, is a bar to a recovery at law. The bill was not filed until the 20th day of January, 1869. The bar to a recovery of the possession of the land in an action at law was complete twelve years before the filing of the bill.

But it is urged by complainants, that they are not barred by the lapse of time, because the defendant acquired the title

by fraud. If fraud had been established, that can not be held a sufficient excuse for the delay and *laches* of the complainants. As early as 1850 the complainants were fully cognizant of all the facts under which the defendant procured the title to the premises, and the delay of nineteen years before proceeding to assert their rights in a court of equity is utterly unaccounted for.

The case of *Cox* v. *Montgomery*, 36 Ill. 396, was a bill in equity to avoid a contract for the exchange of lands, on the ground of fraud. The proof established the existence of fraud, but in deciding the question in regard to the time in which a bill should be filed, it was said: " This species of remedy must be invoked with reasonable diligence. In a country where the value of real estate changed as rapidly as in Illinois, it would be clearly unwise to permit a purchaser of land to retain it for nearly eighteen months after the discovery of the fraud, before filing his bill to rescind. This is an unreasonable delay, which a court of chancery can not tolerate."

The complainants have cited some decisions of other courts upon the question, but a reference to them is not deemed necessary, as the case cited is conclusive upon the point raised. It is, however, urged by the complainants, that, at the time the defendant acquired the title to the land, three of complainants then were and still are under the disability of coverture, and as to them the Statute of Limitations did not run, nor are they concluded by *laches* or acquiescence.

The position taken might be regarded more plausible were it not for an act of the legislature, adopted April 24th, 1861, known as " An act to protect married women in their separate property." Prior to this act, the possession of lands by actual residence, under a connected title deducible of record, would not constitute a bar to a recovery as against a *feme covert*. The saving clause in the act provided, in all the foregoing cases in which the person or persons who shall have a right of entry, title or cause of action, is or shall be, at the time of such right of entry, title or cause of action, under the age of twenty-one years, insane or *feme covert*, such person or per-

sons may make such entry or institute such action, so that the same be done within such time as is within the different sections of this chapter limited, after his or her becoming of full age, sane or *feme sole.*

When this saving clause was enacted for the protection of married women, a *feme covert* could not own personal property. After marriage, the personal estate of the wife became that of the husband. If she possessed lands, the husband acquired an estate, during her life, therein. If a child of the marriage should be born alive, the husband would then take an estate for life as tenant by the curtesy. He had the sole right to the possession of the wife's lands, and the rents, issues and profits thereof. In addition to this, the wife had no power to contract in regard to her property. Under the rigor of the law, in effect, a *feme covert* was divested of her lands and all control over them, and her personal property was transferred to the husband. If her lands should become occupied adversely, she was powerless to prevent the running of the Statute of Limitations by the payment of taxes herself, for the reason the law had stripped her of personal property and money. She could not sue the occupant and recover possession, because the law had given the right of possession to the husband.

The powerless condition of a *feme covert* over her lands, no doubt, induced the enactment of the saving clause in favor of married women. The act of 1861, however, created a radical change of the common law in regard to the rights of married women over their own property. It provides "that all property, both real and personal, belonging to any married woman as her sole and separate property, or which any woman hereafter married owns at the time of her marriage, or which any married woman, during coverture, acquires in good faith from any person other than her husband, by descent, devise or otherwise, together with all the rents, issues, increase and profits thereof, shall, notwithstanding her marriage, be and remain, during coverture, her sole and separate property, under her sole control, and be held and possessed and enjoyed by her the

12—83D ILL.

same as though she was sole and unmarried, and shall not be subject to the disposal, control, or interference of her husband, and shall be exempt from execution or attachment for the debts of her husband."

Under this statute, the wife was given the entire and sole control of her personal and real property. Should her lands be occupied adversely, she could bring ejectment. She could use her own money to pay taxes, and thus prevent an occupant from holding possession and paying taxes until possession and payment would ripen into a bar to a recovery. The reason, therefore, for the enactment of the saving clause for the protection of a *feme covert,* would seem to have been entirely removed by the adoption of the act of 1861.

The scope of this act, and its effect, were fully comprehended by this court as early as 1863, when, for the first time, it came before the court for construction, in *Emerson* v. *Clayton,* 32 Ill. 493, where it was said: " By this statute, a married woman must, since its enactment, be considered a *feme sole* in regard to her estate of every sort owned by her before marriage, or which she may acquire during coverture, in good faith, from any person not her husband, by descent, devise or otherwise, together with all the rents, issues, increases and profits thereof. * * * * They designed to make, and did make, a radical and thorough change in the condition of a *feme covert.* She is *unmarried,* so far as her property is concerned, and can deal with it as she pleases."

If, then, under the act of 1861, a *feme covert* became unmarried, so far as her property was concerned, the conclusion is irresistible that the saving clause in favor of married women, in the Limitation Law, was abrogated, as the two acts are so utterly inconsistent that they can not stand together.

It is true, the act of 1861 does not purport to repeal the saving clause in the Limitation act, but it is manifest a reasonable construction of the language used, in connection with the scope, purpose and object of the statute, produces that result.

Courts are not confined to the literal meaning of the words employed in the construction of statutes, but, as was said

in *Burgett* v. *Burgett*, 1 O. Rep. 221, "The intention of the law-makers may be collected from the cause or necessity of the act; and statutes are sometimes construed contrary to the literal meaning of the words.

"It has been decided that a thing within the letter was not within the statute, unless within its intention. The letter is sometimes restrained, sometimes enlarged, and sometimes the construction is contrary to the letter. (4 Bac. title Statute, 1, secs. 38, 45, 50.) Every statute should be construed with reference to its object, and the will of the law-makers is best promoted by such a construction as secures that object, and excludes every other."

*Slater* v. *Cove*, 3 Ohio St. 80, may be regarded an authority in point upon the question. There, two acts passed by the legislature of Ohio were before the court for construction. One, a limitation act, was passed in 1831, the first section of which fixed the limitation upon actions of trespass upon real property, at four years. The second section contained the provision that, if any person entitled to any other action limited by this act shall, at the time such cause of action accrued, be within the age of twenty-one years, *feme covert*, insane or imprisoned, every such person shall be at liberty to bring such action within the respective times limited by this act, after such disability shall be removed.

When this act was passed, the age of majority for females was twenty-one years. In February, 1834, a law was passed providing that females were of age at the age of eighteen. The act of 1834 did not profess to amend or repeal the act of 1831, nor did its provisions in any manner allude to the act of 1831, and yet it was held that the disability of females was removed when they arrived at the age of eighteen years. In the discussion of the question, the court said: "When the act of the 17th of February, 1834, was passed, fixing the age of eighteen years as the period for the removal of the disability of infancy as to females, although it in nowise repealed or amended the Statute of Limitations, yet, as to females, it produced a change in the circumstances and relations of the sub-

ject matter of this particular provision of the law, which altered not the law, but its application. When the age of twenty-one years ceased to be the period for the removal of the disability as to females, a change was produced in the subject of this provision in the Statute of Limitations, so that the object of the law, its reason and intention being manifestly to provide for the commencement of the running of the Statute of Limitations at the time when the disability of infancy ceased, it became applicable to females at the age of eighteen years instead of the age of twenty-one."

The same reasoning applies with peculiar force to the question under consideration. While the saving clause in the Statute of Limitations is not mentioned in the act of 1861, yet the powers conferred by the act so completely annihilated the existence of every reason which led to the passage of the former act protecting married women from the running of the Statute of Limitations, that it would be absurd to hold that the two acts could stand together.

Again, if a *feme covert* is unmarried, so far as her property is concerned, and she can deal with it as she pleases, as was held in *Emerson* v. *Clayton, supra,* no reason is perceived why she should receive the protection of a saving provision of a statute of limitation. When she was given the management and sole control of her property, she ought at least to assume the responsibilities that are cast upon those of her sex who possess property, and are sole and unmarried.

It may, however, be said that the views here expressed are in conflict with what was said in *Morrison* v. *Norman,* 47 Ill. 477, and *Noble* v. *McFarland,* 51 Ill. 226. In so far as expressions may be found in these and other like cases to the effect that the saving clause in the Statute of Limitations in relation to *femes covert* was unaffected by the act of 1861, they are modified by the construction here given the statute.

If, then, the disability of coverture was removed by the act of 1861, it necessarily follows that the residence of the defendant upon the premises under title deducible of record, forms a complete bar to a recovery. The possession of the defendant

commenced as early as 1850, and the Statute of Limitations then beg017 to run as against the life estate in the husbands of the complainants. This life estate was, therefore, barred prior to the passage of the act of 1861, and when barred, it was, for all practical purposes, gone, and the husbands, in effect, no longer had any interest in the premises.

As was said in *Hinchman* v. *Whetstone*, 23 Ill. 185, when the right of entry and right of action are both lost, it is difficult to perceive what practically remains to the former owner. When, therefore, the life estate which the husbands had acquired by virtue of the marriage, was terminated by operation of the Statute of Limitations, and the act of 1861 removed the disability of coverture of the complainants, they were then bound to bring their action within seven years, or their right or title would be barred. This, complainants failed to do, but permitted the defendant to remain upon the land, undisturbed, for more than seven years after the passage of the act of 1861. By non-action on their part, they have lost their rights; they are not protected by the saving clause of the statute. Their *laches* is inexcusable, and we perceive no ground upon which they can recover.

The decree of the circuit court will be affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE SHELDON, dissenting:

As respects the bearing of the act of 1861, known as the Married Woman's Act, upon the saving clause of the limitation laws, I am disposed to adhere to the former decision of this court, upon this very subject, in *Morrison et al.* v. *Norman et al.* 47 Ill. 477, where, upon due consideration, the following result was announced: "We must hold the saving clause of the limitation laws to be unaffected by the act of 1861."

Mr. JUSTICE DICKEY: I concur in the views of Mr. JUSTICE SHELDON. It is not easy to perceive how the ruling of this court, that the act of 1861 did not dispense with the joining

of the husband with the wife in the conveyance of her separate property, can be justified, if this act be held to have repealed the saving clause in the Statute of Limitations made in favor of a *feme covert*.

Mr. JUSTICE BREESE: I do not concur in this opinion. I think the law was correctly stated in *Morrison* v. *Norman*, 47 Ill. 477, and *Noble* v. *McFarland*, 51 ib. 226. The construction thus placed on the statute in question has become a rule of property, and why that rule should be now discarded, I am at a loss to perceive.