ANNIE HARRIS

v.

DANIEL MCINTYRE et al.

Filed at Ottawa October 5, 1886.

1. NOTICE—by possession of land—as to the character of possession required, in order to operate as notice of occupant's rights. Circumstances which would put an ordinarily prudent and cautious man upon inquiry as to the claim or title of another to a tract of land, will charge him with notice of such facts as a diligent inquiry would have disclosed.

2. The open and visible possession of land by the equitable owner at the time of a conveyance by the holder of the legal title, and the giving of a mortgage by the grantee of the latter to secure a loan, will be sufficient to charge such grantee and mortgagee with notice of the rights of the equitable owner.

3. The possession which will protect the holder of an equitable title must be such as to put purchasers upon inquiry, which, if followed, would lead to notice of such title.

4. A widow furnished her bachelor brother with $1600, with which, together with $500 advanced by him, to buy a farm for their joint use, the title to be taken to each in proportion to the sums advanced by them, respectively. He, however, took a conveyance of the entire estate to himself, and they both moved upon the place in 1869, he managing the land, and she attending to the household duties. The deed was recorded, and he borrowed money and had mortgaged the land to secure the loan, and appeared to the world as the owner for a period of over ten years, during which time the sister took no steps to have her equitable rights enforced or asserted: Held, that her possession under such circumstances was not such a possession as would charge a purchaser or subsequent incumbrancer from her brother with notice of her equitable rights.

5. RESULTING TRUST—when it arises. A resulting trust arises, by implication of law, where land has been purchased with the money of one person and the deed taken to another, who is a stranger,—that is, one not a wife or child, or standing in that relation.

6. If a joint purchase is made in the name of one of the purchasers, and the other pays his share of the purchase money, equity will lay hold of the circumstance of the title being in one, only, and a resulting trust will be declared in favor of the other, for his share.

7. In this case, a person purchased a farm for $2100, of which he furnished $500, and his sister the balance, under an agreement that they should own the premises in the proportion each paid, and he took the title to himself in fraud of her rights: Held, that he would hold the title in trust for

| 118 | 275 |
| 146 | 641 |
| 118 | 275 |
| 148 | 25 |
| 118 | 275 |
| 150 | 207 |
| 118 | 275 |
| 160 | 422 |
| 161 | 596 |
| 118 | 275 |
| 94a$^{14}$ | 56 |
| 95a$^{13}$ | 399 |
| 118 | 275 |
| 98a $^{13}$ | 90 |
| 98a $^{12}$ | 276 |
| 118 | 275 |
| 203 | $^2$509 |
| 204 | $^4$636 |
| 206 | $^5$539 |

her, in the same proportion the money she paid bore to the whole sum paid. The fact the money was paid in pursuance of a prior express contract, would not change the rule.

8. SAME—*Statute of Frauds—of its application in the case of a resulting trust.* As a resulting trust arises upon the allegation and proof of the ownership of the funds used in making a purchase of land, and does not depend upon the contract of the parties made anterior thereto, it will not be affected by the Statute of Frauds.

9. SAME—*laches—delay in asserting a claim to a resulting trust.* Courts of equity will not enforce resulting trusts after great delay in seeking their enforcement, unless there is shown an equitable excuse for the delay. But mere lapse of time will be no bar, if an excuse is given which takes hold upon the conscience of the chancellor, and is such as renders it inequitable that the bar should be interposed.

10. SAME—*effect of an incumbrance created by the holder of the legal title—of partition in such case—apportioning the incumbrance.* Where the facts are such that the law raises a resulting trust, the execution of a mortgage on the premises by the holder of the legal title, without the consent of the *cestui que trust,* will not defeat the right of the latter to enforce the trust as against the former.

11. So where a person holding the legal title to a tract of land, 5-21 parts in his own right, and 16-21 in trust for his sister, fraudulently conveyed the entire property to a brother, who had notice of his sister's equitable title, and that brother gave a mortgage or deed of trust upon the whole land to one having no notice of the sister's rights, it was *held,* on bill to declare and enforce the trust, and for partition, that the court should have found that complainant was the owner of 16-21 parts of the land, and the second brother of the remaining five parts, and made partition accordingly, subject to the lien of the deed of trust, and requiring that the interest of the brother of 5-21 parts be first sold in discharge of such lien, before resorting to the interest of the sister.

12. EVIDENCE—*admissions—of their weight.* Evidence of the admissions and statements of a party in loose or casual conversations, occurring several years before the witnesses are examined, relating to a subject or subjects in which they had no personal interest, where they do not pretend to give the precise language or phraseology used, or show the exact connection in which the language was used, should be received with great caution, and unless corroborated will not be sufficient to establish a resulting trust.

13. LACHES—*in equity—following the law.* Where the statute fixes the time within which to bar a claim when asserted at law, courts of equity will refer to the statute to ascertain the reasonable time in which the bar will be complete in equity, thereby following the law. Where there is no statute applicable, the time in which a party will be barred in equity, necessarily depends upon the particular circumstances of each case.

14. In this case, a person, under a verbal agreement with his sister, bought a farm for $2100, of which he furnished only $500 and his sister the balance, for their joint benefit, but he fraudulently took the conveyance to himself, and they both, shortly·after their purchase, in 1869, went upon the land, making it their home. The brother gave incumbrances on the premises without the knowledge or consent of the sister. It appeared that she reposed great confidence in him, which he shamefully abused, and it appeared that she remained upon the place all the time, in the belief that she owned the greater interest in the same, until in 1881, when she filed her bill to have a resulting trust declared, and to set aside a conveyance made by her brother to one having notice of her equities, and for partition. It was *held*, that she was not barred of relief by her delay in filing the bill, it clearly appearing that she was kept in ignorance of the fraud practiced upon her until shortly before filing her bill, and that there was no possession hostile to her rights.

APPEAL from the Circuit Court of Carroll county; the Hon. JOHN V. EUSTACE, Judge, presiding.

This was a bill in chancery, filed in the Carroll circuit court, by appellant, for partition of certain lands lying in that county. The bill alleges that appellant and her brother, Neil McIntyre, purchased certain described $152\frac{84}{100}$ acres of land, for the sum of $2100, on or about the 6th of February, 1869, and that she paid $1600, and said Neil McIntyre $500, of the purchase money; that she relied upon said Neil to take the title to said land to them jointly, but he took the title wholly to himself; that although the deed was a conveyance of said lands absolutely to said Neil, on its face, it was not intended to be so, but on the contrary, it was expressly agreed and understood that she and said Neil should hold the land as tenants in common, she $\frac{16}{21}$ parts, and he $\frac{5}{21}$ parts; that complainant was a widow, with two children, and said Neil a bachelor, and it was agreed that they would move upon said lands and occupy the same as one family, and they accordingly did so; that said Neil held the $\frac{16}{21}$ parts of said land in trust for her; that said Neil, when she discovered that he had taken the deed to himself, gave her as his reason for so· doing, that she had two minor children to whom the land would descend in case of her death, and that it would be im-

possible for him to get his interest out or sell the land without litigation and great expense; that she had implicit faith in said Neil, believing he would act in the utmost good faith toward herself and children; that they (appellant and said Neil) afterwards purchased of Daniel McIntyre, for the sum of $300, the other forty-acre tract described in the bill, and paid for the same with timber cut off the land first purchased by them, and while the deed was by said Neil taken to himself, it was expressly agreed and understood it should be held by them as tenants in common, with the same interests as they held in the original purchase; that all of said lands since then purchased, were occupied, possessed and controlled by them jointly, until abandoned by Neil, and that she continues to occupy the same; that on the 25th of March, 1879, Neil McIntyre, by warranty deed, conveyed all of said lands to Daniel McIntyre, to secure certain moneys Neil owed him; that on the next day, Daniel McIntyre made and delivered a trust deed of said lands to Henry Ashway, to secure the sum of $1700, payable in three years, to Caroline Marks; charges that Daniel McIntyre had actual notice of the interest of appellant in said lands at the time of the several conveyances to said Neil, and by said Neil to himself; charges that she received no benefit from the conveyance to Daniel McIntyre or Ashway, and never consented thereto, and also, that she being in actual occupancy of the premises, said Ashway and Marks are chargeable with notice. Neil McIntyre, Daniel McIntyre, Henry Ashway and Caroline Marks are made defendants. It is prayed that the interest of appellant be found, and partition be made; that the trust deed to Ashway be removed as a cloud, but, if the said deed is found to be a valid claim against the whole land, that the interest formerly owned by Neil McIntyre be first subjected in payment thereof. Daniel McIntyre answered, denying the bill. Appellees Ashway and Marks denied all knowledge of the equitable rights claimed by appellant, and that they relied on the record and

statements of Daniel and Neil McIntyre, that said Daniel was the owner, etc. On the hearing, the circuit court dismissed the bill, and the complainant brings the case to this court by appeal.

Mr. M. Y. JOHNSON, and Mr. GEORGE L. HOFFMAN, for the appellant:

Where land is purchased with the money of one, and the title taken to another, the latter will hold the title in trust for the party furnishing the money. *Smith* v. *Smith,* 85 Ill. 189.

A resulting trust is a presumption of law, not depending upon any agreement, and hence is not affected by the Statute of Frauds. *Ward* v. *Armstrong,* 84 Ill. 151; *Mahoney* v. *Mahoney,* 65 id. 406; *Wilson* v. *Byers,* 77 id. 76; *Mason* v. *Showalter,* 85 id. 133; *Loften* v. *Witboard,* 92 id. 461; *Chamer* v. *Hoose,* 91 id. 503.

A purchaser from Neil McIntyre with notice of appellant's rights, takes no better title than his vendor, and holds in trust, the same as his vendor. *West* v. *Fitz,* 109 Ill. 425; *McDonald* v. *Snow,* id. 40.

*Laches* is that slothful, negligent conduct that misleads others to their prejudice. There is nothing in this case that has misled anybody.

Appellant's possession, or being upon the place, was sufficient to put a prudent person on inquiry. The law presumes that a prudent man, before purchasing, will take ordinary precaution, and if the land is found occupied, will institute the necessary inquiry to ascertain by whom and by what right he is there. *Trusdale* v. *Ford,* 37 Ill. 214; *Clevinger* v. *Ross,* 109 id. 349; *Rupert* v. *Mark,* 15 id. 540; *Brooks* v. *Bruyn,* 18 id. 542; *Lyman* v. *Russell,* 55 id. 281; *Hubbard* v. *Kids,* 87 id. 578; *Small* v. *Stagg,* 95 id. 39; Story's Eq. Jur. sec. 400.

A purchaser or incumbrancer from a trustee is, in equity, bound by the trust, to the same extent and in the same man-

ner as the person from whom he purchased; and to support the plea of *bona fide* purchaser without notice, the defendant must aver and prove, not only that he had no notice of complainant's rights, but that he paid the money, and took ordinary precaution, such as a prudent man would take, before he is held as an innocent purchaser without notice. Willard's Eq. Jur. 608; *Murry* v. *Ballow,* 1 Johns. Ch. 566; *Wormly* v. *Wormly,* 8 Wheat. 421; *Oliver* v. *Platt,* 3 How. 333; *Bank* v. *Seaton,* 1 Pet. 309; Story's Eq. Jur. secs. 395, 397, 400, 409; 4 Kent's Com. 308; *Mason* v. *Wilson,* 1 Cranch, 100; *Shepherd* v. *McEvers,* 4 Johns. Ch. 136; *White* v. *Carpenter,* 2 Paige's Ch. 222.

Mr. JAMES SHAW, for the appellees:

Resulting trusts, and all trusts which seek to overcome deeds and conveyances, must be proved with great clearness and certainty. Parol evidence to establish them is received with great caution. Such evidence is not regarded with favor, and if denied or contradicted, such evidence is insufficient to establish these old sleeping trusts claimed to exist. Perry on Trusts, 110, and note; *Lantry* v. *Lantry,* 51 Ill. 458; *Mahoney* v. *Mahoney,* 65 id. 406; *Enos* v. *Hunter,* 4 Gilm. 218; *Maple* v. *Nelson,* 31 Iowa, 322; Perry on Trusts, secs. 137–139.

Resulting trusts can not be created by agreements. They are implied equities, only. Trusts created by agreement become express trusts, and must be evidenced by a memorandum, in writing. If the Statute of Frauds is set up as against a resulting trust resting in parol, its effect is inexorable on express trusts not in writing. *McDonald* v. *Stow,* 109 Ill. 44; Perry on Trusts, secs. 126–135; *Hovey* v. *Holcomb,* 11 Ill. 660; *Greene* v. *Cook,* 29 id. 193; *Kane County* v. *Herrington,* 50 id. 237; *Carpenter* v. *Davis,* 72 id. 17; *Holmes* v. *Holmes,* 44 id. 169; *Sheldon* v. *Harding,* id. 69.

Appellant's *laches* is a bar to this suit. Perry on Trusts, secs. 870–141; *Hall* v. *Fullerton,* 69 Ill. 448; *Carpenter* v.

*Carpenter,* 70 id. 457; *Williams* v. *Rhodes,* 81 id. 571; *Castner* v. *Walrod,* 83 id. 171; *McDonald* v. *Stow,* 109 id. 44; *Breit* v. *Yeaton,* 101 id. 244.

Knowingly permitting others to control, manage, buy and sell land, and remaining silent, will ·bar and estop one from afterward setting up equitable claims which should have been announced at the time. *Cochran* v. *Harrow,* 22 Ill. 345; *Lloyd* v. *Lee,* 45 id. 277; Bigelow on Estoppel, 500, 501.

Where possession is relied on as notice to purchasers and others dealing in land, equitable claims not of record, it must be such open and notorious possession as will indicate to neighbors who has the control and management. *Hubbard* v. *Kiddo,* 87 Ill. 580; *Truesdale* v. *Ford,* 37 id. 214; *Strong* v. *Shea,* 83 id. 578; *Smith* v. *Heirs of Jackson,* 76 id. 254.


Mr. JUSTICE SHOPE delivered the opinion of the Court:

It is not alleged in the bill that appellees Ashway and Marks, or either of them, had actual notice of the equitable rights of appellant set up in her bill, and unless she had such possession of the land in question as would put them upon inquiry as to her rights therein, it is not contended that they had any notice whatever.

We have carefully considered the evidence preserved in the record, and find the facts proved to be these: In February, A. D. 1869, appellant, being a widow, with two children, and having $1600, joined with her brother, Neil McIntyre, in the purchase of 152$\frac{84}{100}$ acres of land, known as the Bellows farm, for the purpose, as she claimed, of making it a home for herself and children, and the said Neil, who was a bachelor; that the land cost $2100, she contributing $1600 and said Neil $500 of the purchase money; that it was understood they should own said land as tenants in common, but said Neil, without the knowledge or consent of appellant, took the title to himself, individually; that the deed was so taken Feb-

ruary 6, 1869, and soon after recorded on the land records of Carroll county; that immediately after the acquisition of said land, appellant and her family, and said Neil, moved into the house on the premises, and from that time until the summer of 1881 continued to occupy it all together, as one family, appellant being the housekeeper, and said Neil having control and management of the farm. It does not appear that she assumed or exercised any control or management of the premises or crops grown, or was in any way known except as housekeeper for her brother. Neil was the owner of record, in possession, and in the actual control and management of the premises, disposed of the crops, and assumed to be the exclusive owner at the time of the loan by Marks of the money secured by the trust deed to Ashway. The premises were about to be sold upon a trust deed upon the whole land, executed by said Neil to one Becker, to secure a loan from Gillespie, and said Neil applied to Ashway for a loan upon the land, to pay off such prior incumbrance. This being refused, an arrangement was subsequently made, by which the said Neil agreed to and did convey the land to his brother, Daniel McIntyre, and the loan was made by Ashway to him, of the money of Mrs. Marks, and the trust deed to Ashway, as trustee, taken to secure the same. This was on the 26th day of March, 1879. It appears, therefore, that there was nothing but the bare fact that appellant resided with her children upon the premises, ostensibly as the housekeeper of her brother Neil, to put them or any one upon inquiry. This condition had continued from the spring of A. D. 1869, when they went into possession. That the loan by appellee Ashway, for Mrs. Marks, was made in perfect good faith, and without any actual notice of any claim of appellant to the land in controversy, is abundantly shown by the evidence.

If appellant was, at the time of taking the trust deed by Ashway, in open and visible possession of the land, the law would charge appellees Ashway and Marks with notice of her

equitable interest, or if the circumstances were such that an ordinarily prudent and cautious man would have inquired as to her claim upon the land, they will be held to have been bound to make inquiry, and be chargeable with such notice as diligent inquiry would disclose. Persons acquiring title to or liens upon land can not shut their eyes willfully or negligently, when proper observation would lead to knowledge of the rights of others, and then be heard to insist they had no notice of that which, by the exercise of ordinary care and prudence, would have been apparent to them. The possession, however, which will protect the holder of an equitable title, must be such as to put purchasers upon inquiry, which, if followed, would lead to notice of such equity.

It will be unnecessary to review, here, the numerous adjudications upon this subject. It will be found that at last each case must be determined by the circumstances of that particular case. The chancellor was called upon to say whether the possession of appellant was such as should, under the rule, have put the appellees upon inquiry, and he determined it in the negative, and with that finding we are not dissatisfied. Appellant had permitted, for over ten years, the title to remain of record in her brother. Other mortgages or trust deeds, securing substantially an amount equal to one-half the value of the land, had been executed by the apparent owner, and for some years remained of record unchallenged by her. She had permitted Neil McIntyre, who was invested with the legal title, to exercise, so far as the public could see, exclusive control and management of the farm and its products, without objection by her, or the assertion of any right on her own behalf, while she, to all appearances, was simply the housekeeper for her brother, and so far as shown by the proof, apparently, to the world, occupied the premises in no other capacity. We are of opinion that under these circumstances appellee Ashway was warranted in relying upon the record, and the combined declaration of Neil and Daniel McIntyre,

as to the state of the title, and that there was no such condition of affairs apparent, as, in the exercise of common prudence, would suggest that inquiry would disclose any equitable title in appellant to this land.

As to the appellee Daniel McIntyre, we are of opinion that the decree should be reversed in part. It is true that the evidence is conflicting; but after careful consideration of it, we are satisfied that the decided weight of the evidence sustains the allegations of appellant's bill of complaint. It will serve no good end to go into an extended discussion of the evidence, but it will be sufficient to say that appellant and Neil McIntyre both testify to the principal fact that $1600 of appellant's money went into the purchase, and that the premises first bought were intended for a home for her and her family, and they are corroborated by Barker, whose advice appellant sought in reference to the investment, and by others, while the evidence in contradiction consists, in the main, of declarations of appellant testified to after a considerable lapse of time, and many of them, when considered in the light of the surrounding circumstances, really not necessarily inconsistent with the theory of appellant's case. She is represented as at various times calling the farm Neil's farm, on several occasions saying that she had loaned her brother Neil her money; that she had trusted her brother and had nothing to show for it, and like expressions. Five witnesses thus testify to conversations of appellant at various times, from about the time of the purchase up to within a few years of the litigation. Some of them say she "claimed" to have loaned her money to said Neil, without giving her language, and all are testifying to loose conversations occurring several years before giving their testimony, relating to subjects in which they had no personal interest, and very few of them pretend to give the particular phraseology or to reproduce the exact connection in which the language was employed. In many of the declarations testified to, the change of a word

or the form of expression would render it consistent with the theory of appellant's claim to the land. Of the same character is the evidence introduced by appellant, of declarations of appellee Daniel McIntyre, alleged to have been made at various times prior to this litigation, some of which will be further considered hereafter. This testimony must be received with great caution, and of itself would not be sufficient to entitle appellant to recover, but much of it is strongly corroborative of the testimony of appellant and Neil McIntyre, both as to the main fact, and as to Daniel's knowledge of the equitable interest of appellant in the land.

We are satisfied, from the evidence, that Daniel McIntyre must have known of the equitable rights of appellant, and of the purpose and object of the purchase and the character of her occupancy. Appellant testifies, that before the purchase, Daniel McIntyre, who was also her brother, wanted to know what she was going to do with her money, and that she then told him she and her brother Neil contemplated purchasing the Bellows farm for a home, and he approved of it. Afterwards, when ill, she was worrying about her children, and again her interest in the land was the subject of conversation between them. Neil McIntyre testifies to a full understanding, on the part of Daniel, of Mrs. Harris' relations to this farm, both before and after the purchase. Shortly after the purchase, in the summer of 1869, Robinson, assessor of taxes, finding the title in Neil's name, told Daniel about it, and told him that as he was appellant's elder brother, he ought to advise her what to do, as her money might be lost if Neil should die, to which Daniel replied, in substance, "he guessed they could attend to their own business if other people would let them alone." Another witness testified, that Daniel said he knew Mrs. Harris (appellant) had money invested in the place. Another, that he said, in speaking of the farm: "It is a place Neil and my sister bought; she put in some $1500 or $1600." Another, that he said, in speaking of a controversy over a log

chain: "If Neil had his debts paid, and Annie (appellant) had her money out of the farm, Neil wouldn't have money enough left to buy a log chain." Another, that Daniel said to him that the Bellows farm belonged to his sister, Annie, and another, that he asked Daniel how he was going to get possession of the farm, and said to him, "you know Mrs. Harris' money is in there," to which Daniel replied he knew her money was in the land, but she had nothing to show for it; and other witnesses testify to similar statements and declarations, made at various times, between the purchase, in 1869, and the filing of appellant's bill. It is just to say, that Daniel McIntyre denies having made these statements, and all knowledge of appellant having any interest, legal or equitable, in the land, but insists that whatever money Neil received of appellant was as a loan. We think, however, that the testimony, when all considered, clearly preponderates in appellant's favor.

Nor can the fact that said Neil McIntyre mortgaged the premises to Bemis and Gillespie, militate against this view. It is doubtful if appellant knew of them prior to the conveyance of the land to her brother Daniel. There is abundant evidence to establish that she knew nothing of any advances by Daniel to Neil on account of this land. Both of the brothers seem to have sedulously kept that knowledge from her. Neil swears positively that he purposely kept her in ignorance of his acts, and Daniel nowhere testifies to having told her of his advances, or of any interest he claimed in the land. The witness Kelly swears that three years before giving his testimony, Daniel told him that appellant did not know Neil borrowed money on the land, and he (Daniel) did not believe she knew it then. After Neil had deeded the land to Daniel, and at a time when Daniel received $500 as damages for a right of way through the land, he said to the witness William Fulton: "Suppose I should meet Annie, what would I say to her?" Witness replied, "Tell her the truth," and

Daniel replied, "I can't meet her." She testifies that she had no knowledge whatever of any advances by Daniel, or of any mortgages on the land, or of the conveyance to Daniel, until 1881. As between appellant and said Neil, the execution of these mortgages, to which she in no way consented, could not defeat her equitable title, and Daniel having, as we have found, notice of her rights at the time he took his deed, stands in no better position.

It is, however, insisted, that the bill proceeds upon an express trust created by agreement,—that as it is alleged in the bill of complaint that it was expressly agreed and understood that appellant and said Neil should purchase the land and hold it as tenants in common, in proportion of sixteen to five parts, etc., the proof does not sustain the bill, and also that the case falls within the Statute of Frauds. This, we think, is a misapprehension. It is true, the bill alleges the fact stated, and that appellant and Neil McIntyre were to own the land in the proportion that each advanced of the purchase money,—that this was not done, said Neil taking the title in his own name. The facts proved, show a resulting trust. As said by this court in *Smith* v. *Smith et al.* 85 Ill. 189, "it was none the less such a trust because the money was paid in pursuance of a prior express contract between the parties." The agreement was not that said Neil should convey to her, but that they should purchase and own the land in the proportion that each contributed to the purchase money; and when Neil, acting for both, took the title to himself in fraud of her rights, he held the title so acquired in trust for her, in the same proportion the money she paid bore to the whole consideration paid. *Smith* v. *Smith et al.* *supra; Springer* v. *Springer*, 114 Ill. 550.

A resulting trust arises, by implication of law, when land has been purchased with the money of one person and the deed taken to another, who is a stranger,—that is, not a wife or child, or standing in that relation. Appellant was a stranger,

within this rule. (Perry on Trusts, 143; 2 Washburn on Real Prop. 441; 4 Kent's Com. 306.) It can not be material whether the complainant is entitled, in equity, to the whole land, or only a moiety. If a joint purchase is made in the name of one of the purchasers, and the other pays his share of the purchase money, equity will lay hold of the circumstance of the title being in one only, and a resulting trust will be declared in favor of the other for his share. (2 Story's Eq. Jur. 1206.) The trust here arises upon the allegation and proofs of the ownership of the funds used in making the purchase, and does not depend upon the contract of the parties made anterior thereto, and hence is not affected by the Statute of Frauds. *Wallace* v. *Carpenter,* 85 Ill. 590; *Ward* v. *Armstrong,* 84 id. 151; *McDonald* v. *Stow,* 109 id. 44.

It is next urged, that a court of equity will not enforce this trust because of its staleness, and the *laches* of appellant in asserting her rights. We have already adverted to some features of the case bearing upon this question, and it will be unnecessary to go over them again. However, it appears that the deed to the Bellows farm was made in February, 1869, and possession taken, as already described, in the spring of that year, and that appellant, with her children, resided upon the land, with her brother Neil, until 1881, and upon his abandoning the farm in the summer of that year, she continued in possession, and still resides thereon. The deed from Neil McIntyre to Daniel McIntyre was made March 28, 1879. The bill in this case was filed December 16, 1881. It is the settled doctrine, that courts of equity will not enforce resulting trusts after an unreasonable delay in seeking their enforcement, unless there is shown an equitable excuse for the delay. (Perry on Trusts, 141; 2 Story's Eq. Jur. 1520.) Where the statute fixes the time within which the claim would be barred if asserted at law, courts of equity will refer to the statute as the means of ascertaining the reasonable period in which the bar will be complete in equity, thus, by analogy,

following the law. In cases, however, where there is no statute applicable, the time in which a party will be barred from relief in a court of equity, must necessarily depend upon the peculiar circumstances of each case. (*Castner et al.* v. *Walrod,* 83 Ill. 171; *Kane County* v. *Herrington,* 50 id. 239, and authorities cited.) These principles are sanctioned by an unbroken line of decisions, and it will need the citation of no further authority to sustain them.

It is, however, to be observed, that mere lapse of time, however great, will not bar a recovery, if an excuse therefor be given which takes hold upon the conscience of the chancellor, and is such as renders it inequitable that the bar should be interposed. As we have seen, when Neil McIntyre and appellant moved upon this land, known as the Bellows farm, it was understood between them that it had been purchased for a home for herself and children, and her brother Neil. They were to occupy as one family, while owning the land as tenants in common. The occupancy was, in fact, under that agreement, until in the summer of 1881, when said Neil abandoned the premises. And while appellant may have so permitted said Neil to control and manage the farm, that, with the title in his name, she would be precluded from asserting her title as against strangers who might become purchasers from or acquire liens thereon through said Neil, without notice, yet as between themselves, the holding of Neil was in no sense hostile or adverse to her. She was in the actual occupancy, under an express stipulation and agreement as to the holding. Daniel McIntyre, as we have seen, had actual notice, not only of her equitable title, but the character of her possession, the purpose and object of the purchase, and occupancy of the land, and he took whatever title he acquired by his deed with all the infirmities of the title of his grantor, Neil McIntyre. Again, it is apparent, from the record, that appellant relied implicitly upon her brother Neil, from the inception of the transactions between them. He, as shown

by his own testimony, and that of appellant as well, persistently deceived her as to his dealings in respect to this land. We think it is shown that the fact of his taking the deed to himself, the execution of the trust deed to Becker, the mortgaging to Daniel in 1878, and the sale and conveyance to Daniel in 1879, was by artifice and the most shameless duplicity kept from her knowledge. Nor does it seem quite clear that Daniel McIntyre was wholly guiltless of the deception practiced upon appellant. Be that, however, as it may, as late as the fall of 1879 or 1880, (it does not clearly appear which,) when the rent corn was being hauled to Daniel from this place, she inquired why Daniel was getting the corn, and Neil explained to her that he owed Daniel, and might as well pay him off that way as to haul it to market and bring him the money.

We can not go farther into the testimony, but the whole record shows that appellant had great confidence in her brother, and trusted implicitly to his management for her in respect to this property, and that the trust thus reposed was shamefully betrayed. Daniel had been told by Robinson of his duty, as elder brother, to advise appellant so she might not lose her money. He had replied, in substance, that they could manage their own business if other people would let them alone; and with full knowledge, as we find from the weight of testimony, that the money his sister had received as the proceeds of a policy on the life of her deceased husband, had been used in the purchase of a farm as a home for herself and children, he, in 1875, to secure a debt from Neil to himself, took a mortgage on this land, and afterwards, in March, 1879, assumed the trust deed given to Becker to secure the Gillespie debt, and took an absolute conveyance from Neil to himself, of all this land, including the forty-acre tract mentioned in the bill, without, according to his own showing, giving appellant any notice or saying a word to his sister upon the subject. It appeared, it is true, that appellant

was told, shortly before the making of the deed from Neil to Daniel, that the land was advertised for sale under the Becker trust deed, but it is not shown that she was then told the state of the title, or how, if at all, such sale, if made, would affect her interest in the land. In no view of the case, accepting, as we do, what we regard as the preponderance of the evidence, was there such *laches*, even if Daniel is in position to set it up, as would preclude appellant from enforcing this trust in a court of equity as to the $152\frac{84}{100}$ acres, known as the Bellows farm, as against the said Neil and Daniel McIntyre. As to the forty-acre tract afterwards purchased, as it is alleged, by appellant and said Neil, and paid for out of the proceeds of the timber cut from the Bellows farm, no such equities arise. It does not satisfactorily appear that Daniel had any notice of any equitable title of appellant thereto, or that she furnished any portion of the purchase money. This tract was disconnected from the other lands. Appellant never was, so far as shown by the evidence, in the actual possession of it. It was included in the deed of March 26, 1879, from Neil to Daniel, and we think under that deed he took the title disencumbered by any equities appellant might have had therein.

We are of opinion that the decree of the circuit court should have found appellant equitably entitled to $\frac{16}{21}$ parts of said tract of land known as the Bellows farm, and conveyed by Sarah Bellows to Neil McIntyre by deed dated February 6, 1869, as set forth in the bill and exhibits thereto, and should have declared the trust in her favor therefor, as prayed in her bill, and found the said Daniel McIntyre the owner of $\frac{5}{21}$ parts of said lands, and made partition thereof accordingly, subject, however, to the lien of the deed of trust to appellee Ashway thereon, for the amount of money remaining due thereunder, and requiring that the interest of the said Neil in said $152\frac{84}{100}$ acres of land now owned by said appellee Daniel McIntyre be first exhausted in satisfaction of the sum

secured by said trust deed, before resorting to the interest of appellant in said lands to satisfy the same, and finding that as to the said forty-acre tract, to-wit, the north-west quarter of the north-west quarter of section 18, township 25, range 3 east, fourth principal meridian, the complainant was not entitled to relief.

The decree of the circuit court, dismissing the bill, will be reversed, and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*Decree reversed.*