THE METROPOLITAN TRUST AND SAVINGS BANK *et al. vs.*
MARY E. PERRY, Appellee.—(CORA C. BLOOMHUFF,
Appellant.)

*Opinion filed June 18, 1913.*

1. TRUSTS—*what does not make party a trustee.* If the holder
of the legal title to property conveys the same, the fact that she
thereafter obtains the unrecorded deed and destroys it or keeps it
in her possession does not re-invest her with the title nor make
her a trustee.

2. SAME—*party claiming resulting trust has burden of proof.*
One who asserts a resulting trust has the burden of proving facts
from which the law will raise a trust and establish title contrary
to the record legal title.

3. SAME—*resulting trust arises, if at all, when deed is taken.*
A resulting trust arises, if at all, at the time the deed is taken and
on the facts then existing, and it does not arise from any contract
or agreement of the parties, but is created, by implication of law,
from the two facts of payment of the purchase money by one and
the conveyance of the title thereby purchased to another.

4. SAME—*what does not create resulting trust.* The fact that
much of the money invested by a woman in real estate may have
been given to her at different times by the man with whom she
was living does not create a resulting trust in his favor, if the
money was her own at the time she invested it.

5. EVIDENCE—*party claiming that deeds were executed has the
burden of proof.* One who claims that the party having the legal
title to land executed quit-claim deeds, which disappeared with-
out being recorded, must establish the fact that the deeds were
executed by such owner, and mere proof that quit-claim deeds pur-
porting to have her name signed to them were once in existence
is not sufficient, where it is clear, from the testimony of disinter-
ested witnesses, that the deeds were not genuine but had been pre-
pared by the grantee named therein, with the intention of using
them in case the purported grantor died before he did.

APPEAL from the Circuit Court of Cook county; the
Hon. E. M. MANGAN, Judge, presiding.

DAVID K. TONE, for appellant.

EDWARD H. MORRIS, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Harry A. Perry, who died on December 14, 1909, was a gambler, who had been engaged in book-making, gambling and conducting gambling resorts in Chicago and elsewhere. Prior to 1898 the appellee, Mary E. Perry, (who was then Mary E. Dunn,) a young unmarried woman, had been a frequenter of gambling resorts in Chicago, drinking with men, persuading them to play games of chance, and receiving a commission on money which they played through her influence. About 1897 she became acquainted with Harry A. Perry, and from 1898 they lived together in the relation of husband and wife at different flats and hotels, with the exception of about one year, until January 6, 1906, when they were married, and that relation continued until his death. While they were living together in the illicit relation a conveyance to her of the ground and flat-building known as 5653 Prairie avenue was made on October 20, 1903, by August Johnson and wife. The consideration was $13,300, made up of $5800 paid in cash and checks and the assumption of a mortgage for $7500, which was afterward paid. On January 13, 1905, August Johnson and wife and August Lindholm and wife conveyed to her another piece of ground, with the flat-building thereon, on Calumet avenue. The consideration was $26,000, which was paid in cash, $12,000 being paid to Johnson and Lindholm and $14,000 to the holder of a mortgage. The deeds were recorded when made and the record title has since stood in the name of Mary E. Dunn. In the spring of 1909 Harry A. Perry became insane, and on June 28 of that year the Metropolitan Trust and Savings Bank, the complainant in the original bill in this case, was appointed his conservator. The original bill filed in the circuit court of Cook county against the appellee, Mary E. Perry, alleged that the real estate conveyed to her when she was Mary E. Dunn was paid for with the money of Harry A.

Perry; that by reason of such payment there arose a resulting trust in the property in his favor; that in pursuance of an understanding and agreement between the appellee and Harry A. Perry before their marriage, she executed and delivered to him deeds conveying the title to the property, which were deposited in safety deposit vaults, and that she had access to the vaults and had taken the deeds from the box and had them in her possession or had destroyed them. The prayer was that if the deeds alleged to have been executed were in the possession of the appellee she should be decreed to deliver them over, together with the abstracts and other papers relating to the title, and in case she had destroyed or refused to deliver them, she should be decreed to make proper conveyance or a master in chancery should be authorized and directed to make the same. The appellee answered the bill, denying that the property was paid for by Harry A. Perry or that she ever executed any deed or deeds conveying the premises or that there was any understanding or agreement that she should do so. During the pendency of the suit Harry A. Perry died, leaving a last will and testament, in which the appellant, Cora C. Bloomhuff, was one of the devisees, and she was admitted as a complainant and given leave to file a supplemental bill. The supplemental bill alleged the death of Harry A. Perry, leaving the last will and testament, which was admitted to probate, by which he devised to her and Frank X. Walls one-half of his estate in trust for her benefit for life with a power of appointment of the remainder by her will, and devised the remaining one-half to the appellee and Walls with the same provisions for the benefit of appellee. It was also alleged that Walls refused to qualify or accept the trust. This bill did not waive an answer under oath, and it was answered with general averments similar to those in the answer to the original bill. The only supplemental matter alleged related to the death of Harry A. Perry and his will, and as to such matter the

answer had the force and effect given to an answer under oath, but there was no controversy as to the facts so alleged. The issues were referred to a master in chancery, who took the evidence and reported his conclusions that the money of Harry A. Perry paid for the property; that it was agreed the appellee should hold the legal title in trust for his benefit, with confidence on his part that she would so hold the premises for him; that subsequent to his becoming incapacitated she determined to take advantage of his incapacity and took the position that she was the legal owner of the premises, with the fraudulent intention of depriving him of his beneficial interest, and that these facts operated to create a 'constructive trust in his favor. He recommended a decree in accordance with the prayer of the supplemental bill. The cause was heard by the chancellor on exceptions to the report, which were sustained, and the original and supplemental bills were dismissed for want of equity at the cost of the complainant in the supplemental bill. She appealed from the decree to this court.

It will be observed that neither the original nor supplemental bill alleged any fact necessary to the creation of a trust *ex maleficio* arising by construction of law. The facts alleged were the payment of the consideration by Harry A. Perry, creating a resulting trust in his favor, and the execution of deeds by which he became invested with the legal title. The fact that the appellee had obtained possession of the deeds and still had them or had destroyed them would not re-invest her with the legal title or make her a trustee, and the findings of the master did not follow or correspond with the case made by the original or supplemental bill. It is not claimed by counsel for the appellant that there was a constructive trust, or that facts were alleged or proved sufficient to show such fraud on the part of the appellee that the court would declare her a trustee. Counsel correctly states the questions involved in substance as follows: (1) If Harry A. Perry furnished the money with which the

premises were purchased and the appellee held the title for his benefit and executed quit-claim deeds conveying the premises to him, which deeds were in his possession, unrecorded, when a conservator was appointed, he was the owner of the property, invested with the legal title, and no question of a resulting trust arises; (2) if the consideration was furnished by Harry A. Perry, and there was no presumption, from the relation of the parties to each other, that the conveyances were intended as gifts to the appellee, or if such presumption was rebutted by circumstances showing that they were not intended as gifts, then a resulting trust would arise. Counsel contends that the deeds were executed, and even if they were not executed the property was paid for by Harry A. Perry; that there was no presumption of a gift from the relation of the parties, and the evidence showed that the conveyances were not intended as gifts.

On the question whether the premises were conveyed by the appellee to Harry A. Perry, so that he became the owner of the property and holder of the legal title, the evidence was as follows: In the spring of 1908 Carl Meyer, an attorney, was employed by Perry to draft his will and went with him to safety deposit vaults in Chicago, where Perry took out his papers for examination, to enable the attorney to understand and pass upon his titles. Among other documents there were papers relating to the flat-buildings located on Prairie and Calumet avenues. Meyer then saw among the papers quit-claim deeds purporting to be signed by Mary Dunn and acknowledged before a notary public, quit-claiming the premises to Perry. The deeds were not recorded and Meyer advised Perry to have them recorded, but Perry said there were reasons why he did not have them recorded. Meyer advised him that if he had absolute confidence in the appellee, who was then his wife, the deeds were just as valid as if they had been recorded, but if anything happened to them he would have to show

the facts.    The will was executed on June 6, 1908, and
Perry was then in bad condition and near a nervous break-
down and was going to Battle Creek for treatment for the
disease which afterward proved fatal.    His physician, Dr.
Frank X. Walls, was called in by Meyer when the will was
executed, to be assured that he was all right and capable of
making a will.    Charles F. Bloomhuff, son of the appellant,
testified that in the summer of 1908, after Perry had been
at Battle Creek, the appellee said to Perry that she had
transferred both of the flat-buildings to him, and that this
was while they were having some controversy and both of
them were crying.    Harry Brolasky, who had been a man-
ager of what he called "skin games" and a promoter of
"get-rich-quick" schemes, testified that in April, 1906, in
New Orleans, the appellee said that Perry put the property
in her name and that she deeded it back to him.    There was
an assignment, without date, on the back of a guaranty
policy on the premises to Harry A. Perry, signed by the
appellee when she was Mary E. Dunn.    On February 25,
1905, Harry A. Perry made a will, not describing any
property, and did not mention the appellee in the will, and
on February 16, 1906, she made a will, giving all her prop-
erty to him.    She testified that she signed the assignment
of the guaranty policy because she was told that she should
do so on account of having made the will, and the fact that
he mentioned no property in his will and gave nothing to
her tends to show that she was already provided for.

The fact that Perry had what purported to be the quit-
claim deeds in his possession was not denied, and it was
admitted that appellee had access to the safety deposit vault.
The evidence in her behalf was that Perry did have such
papers.    Milton J. Wolff, who was private secretary for
Harry A. Perry and went with him to the various places
where they were operating, testified that in the fall of 1908
he went with Perry to the safety deposit vault and Perry
handed the deeds to .him;    that the witness asked Perry

where he got them, and told him that they were not even signed right, as the initial "E" was omitted and the name was signed "Mary Dunn," but Perry said they answered the purpose,—that he had shown them to Meyer, who said they passed; that Perry then said that he did not want the deeds any more and that he only had them in case of accident, "but now he was so well covered." The witness said the signature to the deeds was not the signature of the appellee; that Perry showed him the will of the appellee, and put the deeds in with papers that he was going to take out when he left the room. William A. Pinkerton testified that he saw Perry at the office of the witness in May, 1908; that he had two quit-claim deeds; that the witness knew the handwriting of the appellee and said that the signature was not Mrs. Perry's writing; that Perry said, "What of it?" and the witness asked him what he was trying to do,—"break into the penitentiary or get into trouble?" that Perry said her family and he did not get along well, and if she died the property would revert to her family, and that Meyer advised him to put the deeds on record. After some urging by Pinkerton he said he would destroy the papers, and put a match to them and burned them up. Edward Sturgeon, who was an employee of Perry for twenty or twenty-five years and had charge of a poker game for him in Chicago and worked on the books at race-tracks for him as cashier, testified he found some papers in the toilet room, on the floor; that he saw the signature "Mary Dunn" on a deed partly printed and partly written and was going to give the papers to appellee, but before he got to the elevator Perry got off; that the witness handed them to him, saying that he was going to give them to Mrs. Perry, and Perry said it was a mighty good thing that he did not give them to her; that he lost them and would not have her see them for anything in the world; that Perry said he put the job up himself and only wanted the deeds in case she died, and put them in his pocket. Carl Meyer did not remember the

name of the notary appearing on the deeds and there was no other proof that they were executed by the appellee. The burden of proof rested on the appellant to establish the fact that the deeds were executed by the grantor. (*Dagley* v. *Black,* 197 Ill. 53.) The evidence fell short of the requirement of the law in that respect, and in view of the testimony of disinterested witnesses, the necessary conclusion is that the deeds were made by Perry with the intention of using them only in case of the death of the appellee. The improbability of his anticipating her death before his own in the spring of 1908, when he was in failing health and she was young, robust and healthy, is urged by counsel, but if the deeds had been made at that time, the fact of his failing health would not have justified the chancellor in holding that the appellee executed the deeds. As they were signed "Mary Dunn," the inference is that they were made before the marriage, at a time to which the argument does not apply.

The appellant having failed to prove the execution of the quit-claim deeds vesting title in Harry A. Perry, the remaining question is whether he paid for the property when the relations of the parties raised no presumption that the conveyances were intended as gifts or under circumstances showing that they were not so intended. The burden of proof was upon the appellant to prove facts from which the law would raise a trust and establish title contrary to the record legal title. (*VanBuskirk* v. *VanBuskirk,* 148 Ill. 9; *Koster* v. *Miller,* 149 id. 195; *Lord* v. *Reed,* 254 id. 350.) Such a trust arises in favor of one who pays the purchase money or some definite part of the whole, and arises, if at all, at the time the deed is taken and on the facts then existing. It does not arise from any contract or agreement of the parties, but is created, by implication of law, from the two facts of payment of the purchase money by one and conveyance of the title thereby purchased to another. (*Reed* v. *Reed,* 135 Ill. 482; *Furber* v. *Page,* 143 id. 622;

*Dick* v. *Dick,* 172 id. 578; *Keith* v. *Miller,* 174 id. 64; *Pain* v. *Farson,* 179 id. 185.)   There was a great deal of evidence, oral and documentary, both as to the one who paid the purchase price and the ability of the appellee to make the payments.   To analyze the testimony at length and state our views as to the weight and effect to be given to the testimony of different witnesses would be neither beneficial nor practicable.   The evidence tending to show that Harry. A. Perry paid the consideration consisted partly of the fact that he had standing in the name of his mother, Mary J. Tubbs, 250 shares of Illinois Central railroad stock, which was sold and transferred in January, 1905, realizing about $38,750, and there was no explanation where the proceeds of the sale went.   That was about the time the second purchase for $26,000 was made.   But the fact that no one knew what became of the money would be but a slender support for a finding that it went into this property, especially in view of the business in which Perry was engaged.   The first purchase was in 1903, and it is argued. that Perry must have paid for the property because the appellee had no legitimate means of earning money, and the commissions on money that she induced men to play in gambling houses would not account for any substantial sum.   The transactions were closed and the purchase money paid in the office of Edward H. Morris, solicitor for appellee, and there was testimony that on each occasion Perry handed the money to Morris.   There was also testimony that the appellee said at different times that the flats belonged to Perry, and he directed repairs on the buildings at different times and spoke of them as his own.   The evidence for the appellee consisted of her own testimony as to matters concerning which she was competent to testify; testimony of Edward H. Morris, her solicitor, and persons in his office, and bankers, brokers and real estate agents. There was also documentary evidence.   The evidence for the appellee was closed before the master without the tes-

timony of the solicitor, after which appellant was allowed to put in new evidence not of a rebuttal nature, and the witness Brolasky then testified that he had promoted the "get-rich-quick" schemes under the guidance of the solicitor, and also testified to a disreputable transaction by such solicitor. After that the solicitor testified as a witness not only in contradiction of Brolasky, but also generally in the case. His credibility was affected by his relation to the suit, but it was practically the same as the evidence of brokers, bankers and the documentary evidence. The evidence of the possession of means by appellee and that she was able to pay for the property was, that at times before the purchase she had deposit accounts in five or six different banks, and that at the time of the first purchase she had a savings account in the Hibernian Bank, from which she drew $500 on October 5, 1903, and paid $300 as a first deposit on the Prairie avenue purchase. It was proved that Morris paid on that purchase two checks, one for $2000 and another for $263.65, which she re-paid by withdrawing the balance of her deposit, $2403.37, about January 8, 1904. This was testified to by Morris and appellee and a disinterested witness who went to the bank with her. The same witness testified that she was present when the appellee loaned Perry $8000, and he gave her a note for it. There was evidence that in 1899 or 1900 the appellee loaned Mrs. George Hankins $7000,—at one time $5000 and at another $2000,—to take up a loan of Mrs. Hankins at the Fort Dearborn National Bank, secured by diamonds held by the bank, and that the diamonds were delivered to the appellee and the loan was paid to her in 1905 by the sale of the diamonds. There was uncontradicted evidence that appellee bought $10,000 worth of Cook county bonds in July, 1903, through the Merchants Loan and Trust Company, and that they were sold in January, 1905; that she also owned $5000 worth of United States Steel stock, pre-

ferred, bought by her through Finley, Barrell & Co., and in January, 1905, she bought 100 half shares of Reading stock and paid for it $4425. She contradicted every statement of witnesses that she had said the flats belonged to Perry, and when he was sued, in November or December, 1905, by a contractor for work done on the Calumet avenue property which he ordered, he swore that he was not the owner of the property; that he was only acting as agent for his wife when he ordered the work done and that she was the owner of the property. From the time of the purchases the premises were rented by agents, to whom the appellee was introduced as owner; and they paid her the rents, less their commissions. The appellee and Morris and a clerk in his office testified that Perry was not present on the occasion of either purchase and did not hand over the money for the property. She testified that while she was living with Perry before the marriage he gave her considerable sums of money, and while boarding at a hotel gave her $100 a month.

Sufficient has been said to show that the appellant did not make such proof that Harry A. Perry paid for the properties, or either of them, as the law requires. It is beyond question that the appellee had large sums of money which were her own, and the source from which it was derived is not important. If much of it was given to her by Harry A. Perry, as is quite probable, the fact that she invested it in the property did not create a resulting trust. As proof that Perry paid for the property was lacking, there is no occasion to consider what presumption would arise if he had.

The decree is affirmed.           *Decree affirmed.*