[No. 7890.]

### IRVINE V. MINSHULL.

1. EVIDENCE—*Measure of Proof.* One asserting a resulting trust in lands must make clear and convincing proof of the facts from which the trust is to be inferred. (116, 129, 140.)

2. —— *Presumptions.* The legal presumption that one possessed of nego-

tiable paper endorsed in blank is the owner will not prevail over clear proof that the endorsee held the paper merely as trustee for the endorser. (126, 128.)

One holding title to lands as trustee executes an open and public conveyance thereof, which is placed of record. It will be presumed, in the absence of evidence to the contrary, that such conveyance was in lawful execution of the trustee's duty, and that the grantees named in such conveyance were the beneficiaries in the trust. (130.)

The presumption that as between parent and child an advancement is intended as a gift has no place as between brother and sister. (127.)

3. —— *Witness—Competency.* Under sec. 1, c. 229 of the Acts of 1911, an interested party is not competent to give testimony in his own behalf as against one suing or defending as the heir of a decedent, and such disqualified person is not to be censured for failing to offer to testify. (137.)

4. —— *Order of Proof.* Evidence in chief, is not to be received in rebuttal unless cause or excuse be shown for the failure to present it in opening the case. (137.)

5. —— *Declarations.* Testimony of an interested party as to statements alleged to have been made many years previously is to be viewed with suspicion, and scrutinized with infinite care. It should no be credited unless corroborated by strong and unequivocal testimony. (138.)

Testimony of the plaintiff as to declarations made by a party since deceased, inconsistent with the conduct of that party, and with the plaintiff's own conduct during a series of years, was rejected as unworthy of credit. (138, 139.)

6. RESULTING TRUSTS—*Evidence.* A resulting trust in lands arises at once upon the execution of the conveyance, and who is the beneficiary therein depends upon who provided the money with which the purchase was effected.

The burden of proof rests upon the one asserting the trust, and the evidence must be decisive and unequivocal. (129, 130.)

One claiming an undivided interest, and offering evidence, which, if accepted entitles him to the whole estate, is not to prevail by the apparent concession of an interest to his adversary. (130, 131.)

The evidence examined and held entirely insufficient to establish the trust alleged.

*Error to Denver District Court.* Hon. JAMES H. TELLER, Judge.

Messrs. SPURGEON & CASSIDY, Mr. EMERSON J. SHORT, Messrs. GOUDY, TWITCHELL & BURKHARDT, Mr. H. R. KAUS, for plaintiff in error.

Messrs. HUGHES & DORSEY, Mr. E. I. THAYER, Mr. JOHN Q. DIER, for defendant in error.

GARRIGUES, J., delivered the opinion of the court.

This action is brought by Thora E. Minshull as plaintiff, against Mary L. Irvine, spoken of as defendant, to recover an undivided one-third interest in the Shell Block in Denver, Colorado. The findings and decree were in favor of plaintiff, and defendant brings the case here on error. It is not difficult to understand the theory and nature of plaintiff's claim, and the purpose of the action. She alleges that in January, 1903, Joseph E. Hunter, his sister Mary, and his father, jointly purchased the property from the Northwestern Mutual Life Insurance Company of Milwaukee, for $49,000.00, all of which Joseph paid out of his own money and separate funds, and thereafter his sister and father reimbursed him to the extent of one-third, so that each contributed one-third the amount, and each owned an undivided one-third interest; that for their own convenience and accommodation, they caused the deed to be made to Elizabeth B. Hunter; that she contributed nothing and acquired no interest in the property, but took and held the naked legal title, in trust for the use and benefit alike of the three owners; that April 6, 1909, in violation of the trust and confidence reposed in her, she, without consideration, conveyed the whole legal title to her daughter Mary Hunter, who, meantime, had married Doctor Irvine; that March 22, 1904, plaintiff married Joseph; that March 24, 1908, still owning such undivided one-third interest, held in trust by his mother, he died leaving plaintiff, his widow, as his sole heir at law; that by reason thereof plaintiff at his death, became the owner in fee simple of his undivided one-third interest; that until his death Joseph had the active control and management of the property, and after paying all costs and expenses, distributed one-third the net income to his father, one-third to defendant and kept one-third as his own; that after Joseph's death the Hunter family recognized plaintiff's claim of ownership to such one-third inter-

est in the income from the property, and remitted her $100.00 per month from March, 1908, until June, 1910; that plaintiff remarried in May, 1909; that Mother Hunter died in November, 1909; that since June, 1910, defendant has converted all the income to her own use, and refused to account therefor, and repudiates the trust, and claims to own the property and all the income.

The answer admits the deed to Eliabeth B. Hunter and her conveyance to defendant; but denies that the funds of Joseph Hunter were used in the purchase. It alleges that defendant's separate funds went into and paid for the property, derived from cashing nine certificates of deposit owned by and standing in her name; that defendant lived with her parents, and the title was taken in the name of her mother to the end that she might, during her lifetime manage the property and use the income as she desired; that the mother during her lifetime had exclusive possession of and exercised absolute control and ownership over the property, receiving to her own use the income to the exclusion of Joseph Hunter, and executed the trust by deeding the property to defendant; that Joseph Hunter was without means and dependent upon his mother for support, and whatever moneys were given by her to him, were voluntary allowances.

The decree finds that Joseph Hunter at the time of his death, March 24, 1908, owned an undivided one-third interest in and to the property, and to the income, and that plaintiff, as his widow and sole heir, became, at his death, the owner in fee and entitled to the exclusive possession of such interest; that from April 6, 1909, defendant had held such interest in trust for the use and benefit of plaintiff, and defendant is commanded to make, execute and deliver to her a good and sufficient deed of such interest. Plaintiff is given a money judgment in the sum of $3,863.38 against defendant, that being one-third the net income from April 6, 1910 to June 1, 1912.

1. Plaintiff has no interest in the property other than the law cast upon her by the death of her husband, intestate. The interest decreed her is based upon her claim that Joseph Hunter was the cestui of a one-third interest, because he contributed one-third the purchase price paid for the Shell block; therefore to recover, the burden of proof is upon her to clearly show that he furnished such proportional part. The court, under the claim of a resulting trust, awarded plaintiff an undivided one-third interest in the property the trustee had conveyed to, and which was standing in the name of, defendant. Such decree can only be sustained upon clear and convincing proof that one-third the consideration paid for the property was furnished by plaintiff's husband, which in this case means that he owned an undivided one-third interest in certain certificates of deposit, the proceeds of which were used in paying $49,000.00 for the property. Unless the evidence clearly and decisively demonstrates that this was the case, there is nothing upon which to base a decree, and it cannot stand.

The $49,000.00 that paid for the property, was obtained from cashing nine renewal certificates of deposit, issued in 1902 to Mary Hunter, and standing in her name at the time of the purchase, in which plaintiff claimed, and the court found, that Joseph owned an undivided one-third interest. Plaintiff did not claim, nor did the court find that Joseph ever, at any time, owned these certificates. The court found that on account of a commingling of funds, he owned a one-third interest. Counsel for plaintiff take their stand, when they say in their brief: "The most natural one (explanation) and the one which we have constantly asserted, is that, although these certificates were registered in the name of Mary L. Hunter, a one-third interest in them at all times belonged to Joseph E. Hunter." And again: "It is the contention of plaintiff that, while the certificates of deposit had been issued in the name of Mary L. Hunter, one-third interest therein at all times had belonged to Joseph E. Hun-

ter." Plaintiff's counsel by these statements recognize and admit the issue, and any attempt to interject or weave into the case the legal principle that Joseph owned the certificates, merely because he had the temporary possession of and delivered them indorsed by Mary to Mr. Hughes, to be used in paying $49,000.00 for the Shell block, only tends to befog the issue and leads to confusion.

The trial court found that Mary, Joseph, and Father Hunter commingled their funds into these certificates, subsequent to the dissolution of the co-partnership March 10, 1900; that at all times thereafter Joseph had an undivided one-third interest in the certificates, and this counsel say they have constantly asserted. Therefore we must ascertain the source of the fund entering into these certificates, and follow its identity and ownership through the various renewals until we trace the money derived from cashing them, ultimately, into this property.

The evidence is without conflict regarding the ownership and use made of these certificates. The history of the transaction shows that four members of the Hunter family, consisting of T. S. Hunter the father, Elizabeth Hunter the mother, Mary Hunter the daughter and Joseph Hunter the son, came from Indiana, and engaged as co-partners in mining in Cripple Creek. The family lived in Colorado Springs, where they conducted a rooming and boarding house, and "grub staked" Joseph, furnishing him with money for a number of years to carry on the mining business in which they each owned a one-fourth interest. As a result of his operations, the interest they acquired in the Orphan Bell mine was sold in 1898 for $100,000.00 on which the final payment was made in 1899. They invested $26,-500.00 of this money in the Hunter block in Denver, taking the title in the name of Elizabeth Hunter, and they lost $11,935.00 in mining ventures. The father held $58,565.00 of the money in cash and certificates of deposit, and Joseph had $3,000.00 of it on deposit in the First National Bank.

March 10, 1900, they made a final settlement and dissolution of the co-partnership, and a division of all the property and money, by which each received one-fourth the company assets. In this settlement it was ascertained and agreed that $22,015.00 was the sum which each was entitled to receive, and the division was not only made, but the amount was given to each partner. Mother Hunter retained the Hunter block at the valuation paid for it, $26,500.00, and reduced her holdings to $22,015.00 by paying Mary $4,485.00; the father paid Mary $17,530.00, which with the $4,485.00 made up her share; Joseph retained the $3,000.00 he had in the bank, and his father paid him $19,015.00 which he accepted and for which he gave his receipt. The co-partnership was thus dissolved, and final settlement and payment made in full to each member. The funds of Mary and her father were immediately invested in certificates of deposit which were renewed from year to year, and ultimately used in paying for the Shell block. The record is barren of any evidence that Joseph at any time commingled any of his funds with the money used to purchase these certificates, or that he had any interest therein. For the purpose of showing the nature and character of the co-partnership, its dissolution, the settlement, payment in full and receipts given, the agreement is here set out in full, and is as follows:

"Denver, Colorado, Mch. 10, 1900.

Whereas, T. S. Hunter, Elizabeth Hunter, M. L. Hunter and J. E. Hunter have been engaged in the business of mining, and

Whereas, the said parties have heretofore received from the sale of their stock in the Orphan Bell M. & M. Co., the sum of one hundred thousand dollars ($100,000), and

Whereas, the sum of twenty-six thousand five hundred dollars ($26,500) has been expended in the purchase of the Hunter Block at the cor. of 19th and Curtis Sts., Denver, Colorado, and

Whereas, the sum of eleven thousand nine hundred and thirty-five ($11,935) has been lost in the various enterprises heretofore engaged in principally with Mr. T. B. Burbridge at Cripple Creek, Colo., and

Whereas, the following sums of cash are held by the following parties to this partnership, viz:

By T. S. Hunter........$58,565
By J. E. Hunter........  3,000     $61,565

and belonging to said partnership and unexpended, and

Whereas, it is desired to make a final division of said money and property,

Now, therefore, this agreement mutually entered into by and between all the parties, witnesseth:

That each party is entitled to a one-fourth interest in property or money on account of said settlement.

That said Elizabeth Hunter shall take and reserve for her own separate estate the block at the cor. of 19th and Curtis Sts. known as the Hunter Block;

That said Elizabeth Hunter hereby agrees in consideration of said settlement to pay to the said M. L. Hunter the sum of four thousand four hundred and eighty-five ($4485.) dollars;

That said T. S. Hunter shall pay over to J. E. Hunter the sum of nineteen thousand and fifteen dollars;

That said J. E. Hunter shall retain the three thousand dollars now in his hands and the nineteen thousand and fifteen dollars received from T. S. Hunter, in full of all his demands against the property and funds belonging to said partnership;

That said T. S. Hunter shall pay over to M. L. Hunter the sum of seventeen thousand five hundred and thirty ($17530) dollars which the said M. L. Hunter shall accept and receive as her full share and in full of all her demands against the property and funds belonging to said partnership;

That the said T. S. Hunter shall have and retain the sum of twenty-two thousand and fifteen ($22015) dollars as his full share and in full of all his demands against the property and funds belonging to said partnership;

That the partnership heretofore existing is hereby terminated and ended.

It is further mutually agreed and understood as follows:

That J. E. Hunter is the sole owner of the real estate standing in his name in El Paso and Teller counties, Colorado.

That T. S. Hunter and E. Hunter are the sole owners of the real estate standing in the names of M. B. and J. E. Hunter, and situate in Baca County, Colorado, and the stock of the Ramey Mammoth Mountain Tunnel Company of Creede, Colo., and now standing in the name of J. E. Hunter, who shall hold the same as trustee until disposed of or demanded by the true owners.

In witness whereof the parties hereto have hereunto set their hands and seals in the presence of each other this 10th day of March, A. D., 1900.

J. E. Hunter,
Elizabeth Hunter,
M. L. Hunter,
T. S. Hunter.

Witness present:
    W. H. Spurgeon.

Denver, Colorado, Mch. 10, 1900.

Received of T. S. Hunter the sum of nineteen thousand and fifteen ($19015) dollars in full settlement as per agreement of even date herewith.

J. E. Hunter.

Denver, Colorado, Mch. 10, 1900.

Received of T. S. and E. Hunter the sum of twenty-two

thousand and fifteen ($22015) dollars in full of all demands as per agreement of even date herewith.

M. L. Hunter."

The evidence shows that Father Hunter deposited in the First National bank, after the settlement in 1900, $24,-960.00 for which he received five certificates of deposit payable to his order one year after date with interest at 3 per cent, as follows:

| | |
|---|---|
| April 27, 1900 | $4,360.00 |
| April 27, 1900 | 5,000.00 |
| May 10, 1900 | 5,000.00 |
| May 10, 1900 | 5,600.00 |
| May 10, 1900 | 5,000.00 |
| Total | $24,960.00 |

There is no evidence that he had no other funds, and the excess of $2,945.00 above his share in the settlement is easily accounted for by the fact that he had considerable money besides the $22,015.00.

Mary L. Hunter deposited her share less $175.00, in the First National bank, for which she received five certificates of deposit drawing the same rate of interest, as follows:

| | |
|---|---|
| April 27, 1900 | $5,000.00 |
| April 27, 1900 | 5,000.00 |
| April 27, 1900 | 1,440.00 |
| May 10, 1900 | 5,000.00 |
| May 10, 1900 | 5,400.00 |
| Total | $21,840.00 |

At the settlement, as part payment of the amount received from her father, she accepted two certificates of deposit of $5,000.00 each, which had been issued to him May 9, 1899, which were reissued to her in new certificates, dated May

10, 1900, for the principal and interest. These ten certificates standing in the name of Mary and her father, at the time of their maturity aggregated with interest, $48,204. Before maturity, Father Hunter endorsed and delivered to Mary his five certificates. He testified on the trial that he intended at the time to give them to her; that they were her's, and that Joseph Hunter had no interest in them. When the ten certificates matured in April and May, 1901, Mary renewed them by taking in her name eleven new certificates for the principal and interest, as follows:

| | |
|---|---|
| April 27, 1901 | $1,424.00 |
| April 27, 1901 | 5,000.00 |
| April 27, 1901 | 5,000.00 |
| April 27, 1901 | 5,000.00 |
| April 27, 1901 | 5,000.00 |
| May 10, 1901 | 5,000.00 |
| May 10, 1901 | 5,000.00 |
| May 10, 1901 | 5,000.00 |
| May 10, 1901 | 5,000.00 |
| May 10, 1901 | 5,000.00 |
| May 10, 1901 | 1,780.00 |
| Total | $48,204.00 |

aggregating exactly the amount of the ten certificates, principal and interest issued to her and her father in 1900. The five certificates issued April 27, 1901, to Mary, equal the principal and interest of all the certificates issued April 27, 1900 to Mary and her father, and the six certificates issued to Mary May 10, 1901, equal the principal and interest of all the certificates issued to Mary and her father May 10, 1900.

When the eleven 1901 certificates amounting, principal and interest, to $49,650.10, matured in April and May, she renewed them by taking nine new certificates in her name, as follows:

| | |
|---|---|
| April 29, 1902 | $ 1,466.70 |
| April 29, 1902 | 10,300.00 |
| April 29, 1902 | 10,300.00 |
| May 10, 1902 | 5,600.00 |
| May 10, 1902 | 1,983.40 |
| May 10, 1902 | 5,000.00 |
| May 10, 1902 | 5,000.00 |
| May 10, 1902 | 5,000.00 |
| May 10, 1902 | 5,000.00 |
| Total | $49,650.10 |

which at maturity in April and May, 1903, aggregated, principal and interest, exactly $51,139.60. It was the money derived from cashing these certificates that paid for the Shell block, and the only question is, whether the finding of the court that Joseph Hunter owned an undivided one-third interest in them is supported by clear and convincing evidence. The testimony fails to show that a single penny of Joseph Hunter's money was commingled in the fund invested in these certificates, or that he had any interest therein. At the time of the trial, nine or ten years after the settlement, Mother Hunter, Joseph Hunter and Charles J. Hughes, Jr., were dead; Mary's tongue was sealed by the statute; Father Hunter was in his second childhood, and the three bank employes who conducted the business had no personal recollection of the transaction.

Mary Hunter used none of the interest on these certificates, but always allowed it to accumulate, and reinvested the full amount of principal and interest in renewal certificates taken in her name, and retained the possession of them, until, previous to the purchase of the Shell block, when she endorsed and delivered them to Joseph Hunter, who turned them over, without additional endorsement, to Charles J. Hughes, Jr., the attorney in the transaction, to be used by him for a specific purpose, the balance to be returned, and he, without endorsing, delivered them to the

bank, where eventually they were used for the purchase of
the Shell block.  The receipt he gave for them, is as follows:

"Denver, Colorado, January 10, 1903.

Received this day from J. E. Hunter the following de-
scribed certificates of deposit, issued by the First National
Bank to Mary L. Hunter, and by her endorsed, to-wit:

| | | |
|---|---|---:|
| (1) | May 10th, 1902.................. | $ 5,000.00 |
| (2) | May 10th, 1902.................. | 5,000.00 |
| (3) | May 10th, 1902.................. | 5,600.00 |
| (4) | April 29th, 1902................ | 10,300.00 |
| (5) | April 29th, 1902................ | 1,466.70 |
| (6) | May 10th, 1902.................. | 1,983.40 |
| (7) | May 10th, 1902.................. | 5,000.00 |
| (8) | April 29th, 1902................ | 10.300.00 |
| (9) | May 10th, 1902.................. | 5,000.00 |

$49,650.10

Charles J. Hughes, Jr.

Received for the purpose of being used in paying $49,-
000.00 for Shell block and balance to be returned.

C. J. Hughes, Jr."

No one should doubt after reading this document, that
the funds invested in these certificates paid for the Shell
block.  The payment was made and the deed delivered in
Denver on the 16th of January, 1903, and it was on the 10th
that Charles J. Hughes, Jr., acting in his capacity as at-
torney in the transaction issued the receipt which evidently
Joseph delivered to Mary; at least she had possession of it,
and introduced it in evidence on the trial, and it is fair to
presume she obtained it from Joseph during the transaction.
A comparison will show that the nine certificates mentioned
in the receipt tally in date and amount exactly with the nine
certificates issued in 1902 to Mary.  In addition to this,
there is oral evidence that Joseph said the property was

paid for with certificates of deposit. All the certificates did not mature until May 10, and if they had been cashed on January 16th, a year's interest would have been forfeited. It appears from the evidence that the plan pursued was to so use the certificates that no interest on them would be lost. This matter was handled under the direction of the attorney, and there is evidence that Joseph said Mr. Hughes conceived the plan which was carried out with the bank, as follows: Joseph gave a note dated January 16, to the bank for $49,000.00, maturing May 10th, with which his account was credited; the certificates, endorsed by Mary, were deposited with this note to secure its payment; Joseph then gave his personal check to the bank for the cashier's check of $49,000.00 which was used January 16th in paying for the property. The discount teller testified that May 10, 1903, when the note and last certificates fell due, he paid the note by cashing the certificates, which with interest, then amounted to $51,139.60. The note and interest amounted to $49,931.16, leaving a balance, after paying the note, of $1,208.44, which was placed to the credit of Joseph Hunter. On the back of the cancelled note the discount teller at the time, made the following memoranda:

"CDs    49,650.10
Int.    1,489.50

_____
51,139.60
Note & Int.    49,931.16

_____
1,208.44"

There is no rational escape from the conclusion that this method was adopted merely as a convenient arrangement for getting the money from the bank with which to pay for the property with the certificates, without cashing them befor maturity and losing the interest. Because the transaction was conducted in this manner does not change its

character. In a court of equity, which searches the whole matter, it cannot be said that the money realized from cashing the certificates paid the note, but did not go into the payment of the land. The note was but an expedient. It was not the money realized from it, but that which was obtained from cashing the certificates that ultimately paid for the property and under such circumstances it would be idle to contend that they were not used for that purpose.

2. Plaintiff's counsel have interwoven through their argument what they call a *prima facie* case made, which, they claim, established that Joseph Hunter owned, not only an undivided one-third interest in, but the legal title to the whole of the certificates, which would have entitled plaintiff to a decree for all the property, had she not in her complaint conceded a one-third interest to Mary and her father, each. Such contention is based upon a rule of the law merchant, that an endorsement in blank of negotiable paper transfers the legal title, and possession raises a legal presumption of ownership; therefore, inasmuch as Joseph Hunter could not have delivered the endorsed certificates without having the possession of them, the presumption in law is, when he delivered them endorsed by Mary, to Mr. Hughes, that he owned them, which made a *prima facie* case that he paid for the property with his own funds. No doubt as a legal principle, mere possession of negotiable paper payable to order, endorsed in blank, raises a legal presumption of ownership in the holder; but we fail to appreciate how such a rule of the law merchant can in justice, be controlling, conclusive, or even applied to this equitable action. Courts of equity sift the whole transaction. These certificates constituted in the main, Mary Hunter's entire fortune, upon which she was dependent, and there is not a single trace of evidence showing any transaction whereby she either gave, sold, or loaned them or their proceeds to Joseph. Counsel contend in one breath, she was grasping and avaricious, and in the next argue that she may have intended to give

the certificates to Joseph. The presumption of gift that arises between parent and child, does not exist between brother and sister. They are within the rule of strangers, and between them no gift is presumed and none was shown. *Harris v. McIntyre,* 118 Ill. 275, 8 N. E. 182.

The certificates were not endorsed by Joseph and there is no evidence that Mary received any consideration for them except as they went into this property. There is not the slightest evidence from which a loan can even be suspected. Business transactions involving a sale or loan of this magnitude leave some antecedent or subsequent marks, or indicia, by which they can be traced. Here nothing of that character is present, and any indication of a gift, loan or sale of these certificates to Joseph, is wanting. Counsel say, he repeatedly and consistently, during his lifetime, claimed and asserted that he had an interest in the property. We have searched the record diligently and fail to find any legitimate evidence showing that he ever made such a claim or contention; on the contrary, there is evidence that he stated on different occasions that he had no interest in the property.

Joseph Hunter died in the spring of 1908 and his mother died in the fall of 1909. Plaintiff asserted no trust against Mother Hunter, and it was not until this suit was brought in July, 1911, that it was ever asserted by anyone that Joseph Hunter was the beneficiary of a resulting trust in this property. Counsel must have anticipated that they could not successfully maintain an action for all the property when they claimed and sued for only one-third. Beyond the mere legal presumption of ownership arising from the temporary possession of the endorsed paper, plaintiff did nothing to establish a *prima facie* case that Joseph Hunter had acquired, in his own right, over $50,000.00 worth of certificates of deposit issued to and owned by his sister, which were used in paying for this property. This is an equitable suit in which the court looks through and beyond

the purely technical presumption of law arising from the mere possession of endorsed negotiable paper and goes into the whole transaction. Viewed in this light it would be an unjust and improper application of the law merchant, a perversion of legal principles and unconscionable to stop at this legal presumption of ownership, and hold that Joseph Hunter was the sole owner in his own right of these certificates merely because he received them from the defendant endorsed and delivered them to Mr. Hughes to be used in paying for the Shell block. The judgment cannot be sustained upon the theory of a *prima facie* case that Joseph Hunter owned the certificates because he had their possession endorsed, and delivered them to Mr. Hughes. The lower court expressly repudiated it, and stated that the evidence did not warrant any such belief. It very properly found and held that plaintiff admitted that there were other beneficiaries than Joseph; that he was not the sole beneficiary; but that Mary and her father each owned a one-third interest in the property. If he was not the sole beneficiary, and they were beneficiaries, as plaintiff admits, and as her counsel say they have always contended, they became such because they furnished at the inception of the trust, one-third the money used in the purchase. They could not become beneficiaries after the purchase. The status of each beneficiary must be determined by the money he furnished which went into the property at the time it was deeded. The ownership, if any, in a resulting trust, is determined by who furnished the money that went into the property at the time the title was taken in the name of another. An implied trust like this, is created at once when the deed is made, and is coeval with the deed. The cestui of this trust was created at the time the deed was taken conveying the legal title to Mrs. Hunter. No subsequent action of the parties could change this particular trust. Plaintiff only claims an interest *pro tanto*, according to the proportion of the consideration furnished by her husband

and she must show the precise amount of his funds that went into the property when the deed was made. The court determined this matter by finding that there had been a commingling of their funds by Joseph, Mary, and their father, after the dissolution in January, 1900, by reason of which each owned an undivided one-third interest in the certificates, and counsel repeatedly say in their brief that they have always contended that Joseph Hunter at all times owned such an interest in the certificates. They have made no trifling contention that they meant by this that he owned a one-third interest because he owned the whole of the certificates. By the ordinary use of words, it is the common understanding that when a party says he owns a one-third interest in property, that is all he does own. The question then, is whether Joseph Hunter owned a one-third interest in the certificates that went into the property; not whether he owned the whole of them, and argument about a *prima facie case* made, that he owned the whole of the certificates, is foreign to the case and immaterial. Instead of clarifying, it only confuses and befogs the issue. Such a contention is not in the case, and should be disregarded. The real issue involved, is whether the evidence justifies the finding of the lower court that Joseph Hunter owned a one-third interest in the certificates.

3. It is very adroitly argued that as plaintiff concedes a definite interest to defendant, if she is dissatisfied, the burden of proof is upon her to establish a greater interest. Defendant now holds the legal title, conveyed to her in purported execution of the trust, and plaintiff must by proof, and not by concessions, establish an interest in her intestate in a resulting trust in the property. The issue is not whether defendant has a greater interest in the property than plaintiff concedes, but whether plaintiff's intestate owned a third interest in the property deeded by the trustee to defendant, and the burden was upon plaintiff to establish such interest in her husband by clear, unequivocal and de-

cisive evidence. *Hayden v. Dannenberg,* 42 Okla. 776, 143 Pac. 859; *Van Buskirk v. Van Buskirk,* 148 Ill. 1, 35 N. E. 383; *Woodside v. Hewel,* 109 Cal. 481, 42 Pac. 152; *Plass v. Plass,* 122 Cal. 3, 54 Pac. 372. The Oklahoma case contains an interesting and valuable collection of authorities from many states relating to the quantum of proof required in cases of this nature.

Mother Hunter was a nominal purchaser. Some one else paid the purchase price, for whom she held the title in trust. It stands to reason if Joseph, Mary, and her father each furnished one-third the purchase price, and each owned an undivided one-third interest in the property, that Mother Hunter must have known it. The law will not presume she betrayed the confidence reposed in her, violated her trust, and defrauded the other members of the family, by conveying property they owned, to Mary. She made an open and public conveyance to defendant, which was placed upon record, conveying to her the legal title. It is this title plaintiff is seeking to overthrow, and it will be presumed under such circumstances that the trustee did her duty, and made the conveyance in lawful execution of the trust. The legal title in such a case is presumed to be a good title until the contrary appears, and plaintiff claiming it is not—that her intestate was a beneficiary and that the trustee violated the trust—has the burden of establishing her claim by clear and convincing evidence, and could not shift, escape, discharge or overcome such burden by conceding in her complaint an interest in the defendant less than the whole. The trustee conveyed the legal title to defendant in apparent good faith, in execution of the trust, and plaintiff brought this suit, claiming a resulting trust to the extent of a one-third interest in the property, in favor of her husband, which she has the burden of establishing. Plaintiff's position before the court was that her intestate owned a one-third interest in the certificates traced into the property, and she had the burden of sustaining her position by the

kind and quality of proof required in establishing a beneficial interest in such cases, and conceding an interest in the property to defendant did not relieve her of this burden.

4. The judgment of the trial court that Mrs. Hunter was Joseph Hunter's trustee of a resulting trust is based upon a finding that there was a commingling of funds, subsequent to the division in 1900, by Mary, Joseph and their father, which resulted in each owning a one-third interest in the certificates. Such finding can only be sustained upon clear, strong, certain and convincing proof. The evidence is, that March 10, 1900, Joseph Hunter received from the co-partnership all the funds belonging to him; but there is no testimony to the effect that he afterwards turned a dollar from any source over to his sister, or his father, or that he commingled a penny with their funds, or was the owner of any part of the money entering into these certificates. After the final payment on the mine in 1899, and before the division in 1900, Father Hunter held $58,565.00 of the co-partnership funds in his own name. The commingling prior to this division was in fourths, not thirds, and after the division there is no evidence that the funds of any of the members of the family were commingled or invested in certificates of deposit standing in the name of some member of the family, as found by the court, unless the giving of the five certificates in 1910 by Father Hunter to Mary, constituted the commingling to which the court referred.

5. The lower court mentions the proof of certain "unquestioned facts" as the basis for holding that Joseph Hunter at his death owned a one-third interest in the Shell block. The court found and the evidence shows the Shell block was paid for by cashing nine certificates of deposit standing in the name of Mary Hunter, so the "unquestioned facts" mentioned by the court must establish that Joseph Hunter owned a one-third interest in the certificates. One fact mentioned by the court, is that Joseph Hunter kept the balance of $1,208.44 which Mr. Hughes said in his receipt

was to be returned. When we remember that Mr. Hughes was acting for another, his receipt undoubtedly means the balance was to be returned to the owner of the certificates. If Joseph Hunter owned the certificates, and was acting for himself, with Mr. Hughes as his counsel, no receipt was necessary, and there is little probability that one would have been asked for or given. There is no evidence that the discount teller received any instructions about the balance, and when he paid the note by cashing the certificates, it was natural, in the absence of instructions, that he should place the balance to Joseph Hunter's credit. True, Joseph shortly afterwards left for New York and checked out the balance, but because he used his sister's money, without her consent, and because she did not institute criminal or civil proceedings against him, is no evidence that he owned a one-third interest in the certificates. If he had owned such an interest, he should have taken only one-third, and not the entire balance. As he claimed to have saved $1,200.00 in interest on the certificates, and the evidence shows he thought of claiming a commission for his services, he may have eased his conscience on the ground that he considered he was entitled to the balance. But aside from what his motives may have been, the mere fact that he retained this amount is no proof that he owned a one-third interest in the certificates.

6.    Another so called "unquestioned fact" is that it is said that Father Hunter testified that Mary, Joseph and himself owned the certificates jointly. His evidence is exactly to the contrary and no witness disputed it. He testified that in the settlement of 1900, Mary and Joseph, as their receipts show, were paid in full; that the $24,960.00 represented by five certificates standing in his name, was his, and that Joseph had no interest therein. He was called as a witness by plaintiff, and further testified that he endorsed the certificates and gave them to Mary, after which they belonged to her, and that he had no interest in them

or the property they were used to purchase. He was in his dotage, and at times his evidence appears silly, but he was frank and open, and there is no suggestion that he was intentionally evasive or trying to deceive the court. When it is considered that he was past 74 years of age, in his second childhood, and that his mind and memory were slow and weak in action, there is no difficulty in understanding his manner and demeanor on the trial, and the effect of his evidence. We are persuaded that the court must have taken what he admitted he said out of court, instead of his testimony on the trial, as his evidence. Plaintiff could not prove that Joseph Hunter owned a one-third interest in the Shell block, by what Father Hunter stated out of court. No claim was made that he was a hostile witness who had deceived plaintiff, or that his evidence was a surprise, and no request was made for permission to cross-examine him for this reason, to lay the ground for impeachment. After he had testified as above stated, his attention was called to the alleged contradictory statements made by him out of court, by plaintiff's counsel, and he admitted making them, but explained that after seeing the certificates which he had endorsed over twelve years before, and thinking the matter over, it had refreshed his memory, so that he recollected the facts more clearly relating to the transaction, and that he was mistaken in what he had said out of court. Counsel could only ask his witness such questions for the purpose of refreshing his memory and not for the purpose of proving that Joseph Hunter owned a one-third interest in the certificates. The time and place Father Hunter could testify to what interest Joseph had in the certificates, was on the trial. Counsel had the right, for the purpose of refreshing his memory, to call his attention to any alleged contradictory statements made out of court; but it would be an anomalous proceeding to predicate facts on a trial upon the unsworn statements of a witness out of court.

7.    Another "unquestioned fact" stated by the court

is that Father Hunter received one-third the income from the Shell block. There is no such evidence in the record. The statement is probably based upon the fact that at the death of Mrs. Hunter, the family safety deposit box contained $12,000.00 in cash, of which Mr. Hunter claimed $8,000.00 and said $4,000.00 belonged to his wife, and it is said as $8,000.00 approximates one-third the net income of the Shell block during the period, therefore this must have been the net income received by him. Because he claimed to own this $8,000.00 is no proof it was income received by him from the Shell block. Mr. Hunter possessed money and had sources of income other than from the Shell block.

8. Notwithstanding counsel's argument that Mary may, in her generosity, have given these certificates to Joseph, it is seriously contended her bank account was so very limited, and she was so avaricious as to claim the entire $12,000.00 in the safety deposit box, after her mother's death, that if the Shell block belonged to her, she would not have permitted one-third the income to be paid to her father and brother, each. In the first place, there is no proof that one-third the income was paid to either of them, and secondly, we do not see how her pecuniary condition or avaricious nature can, if the statements concerning them were true, be used against her as any proof that Joseph owned a one-third interest in the certificates. When we remember there is evidence to the effect that Mrs. Hunter hesitated somtime before deeding the Hunter block to Father Hunter, and only consented to do so after it was agreed that Mary, at her mother's death, should have the cash in the safety deposit box, there is nothing unusual or strange in her claiming it. The evidence does not support the contention that she had a quarrel with her father over this money. Each claimed it, but they settled the matter amicably by dividing it equally. Father Hunter denied that any of the income from the Shell block was paid to him, and the find-

ing that he received one-third of it, is unsupported by any evidence.

9. It is further contended, as an established fact, that Joseph Hunter owned and was paid one-third the net income from the Shell block. There is no proof of either. An analysis of the figures, taken month by month, shows the fallacy of such a finding, and discloses that the ratio between his monthly allowance, and the monthly net income from the Shell block, is not as 1 to 3, or anything like it. It took the net income of four months each year to pay the taxes, and there were other heavy expenses. The property during the first part of the period only brought a gross income of $500.00 a month, which was paid to Mrs. Hunter, who always had the entire charge and management of the income and property.

Joseph Hunter left Colorado in December, 1904, and did not return until March, 1907. There is no evidence that he received any of the income from January, 1903, to January, 1905, except on one or two occasions when he managed to get hold of the monthly check, which he probably appropriated as he did the $1,208.44. During this time he leased the safety deposit vault in one of the business blocks in Denver, and made a business of renting the boxes to others. He was to pay $75.00 a month for this privilege, but his mother paid it for him, and he lived on the $100.00 a month income from this source. He was unable to support himself on account of his habits, and the family helped to take care of him; but there is no evidence that he drew or was paid an income from the Shell block. Beginning with the month of January, 1905, after he left Colorado, his mother gave him an allowance of $150.00 a month, which was sent to him by the agent, and during the first six months, one-half was charged to the Shell block, and one-half to the. Hunter block. During the balance of his life the gross income from the Shell block was $550.00 per month and the net very much less. Notwithstanding this, he re-

ceived an allowance of $200.00 a month from his mother, sent him by the agent of the property at her direction, irrespective of the income, which remittance was largely in excess of one-third the net monthly earnings of the property. The remittances to Joseph were never based upon any ownership he had in the income. If they had been, there would have been many months when he would have received nothing, and at no time would he have received $200.00 a month. He was a spendthrift, and drank intoxicating liquors to excess. There is evidence that he soon squandered his fortune and no evidence that he was engaged in any profitable employment. In fact, there is evidence that he was incapacitated from earning a living, and that his mother supported him. He spent much of his time in New York, Boston, Youngstown and the South, during which time the family on two occasions had to send him money in addition to the monthly allowance. He returned to Colorado in the spring of 1907, where he died in March, 1908. During this time he was sick of a fatal disease, and the family paid his hotel, doctor, hospital, nurse, funeral and other expenses, but there is no evidence these were paid out of any income owned by him in the Shell block. There is testimony that he told a neighbor in the summer of 1902, that he had spent over $20,000.00 on his first wife, and she had left him; that if it were not for his mother and sister, he would be a dog upon the streets. The mere fact that the allowance or part of it, or the money given him by his mother, came from income from the Shell block, without any proof that he owned it, does not raise a presumption that he had any interest in the block, or in the certificates that paid for it.

10.   Plaintiff alleges that Joseph Hunter had the entire management and control of the property from the time it was purchased in January, 1903, to the time of his death in March, 1908, and that after paying all expenses, that he distributed one-third of the income to Mary, one-third to

his father, and kept one-third for himself. These are not the facts. The evidence is that Mrs. Hunter had the entire charge, control and management of the property and income, which was paid to her. She was the only person the agent recognized as having any interest in or authority over the property.

11. Unfavorable comment is made in the argument on the failure of defendant to take the stand and testify. The statute—Laws of 1911, p. 676—provides, that no party to any civil action shall be allowed to testify therein, in his own behalf, when any adverse party sues or defends as the heir of any deceased person, unless called by the adverse party. Plaintiff was suing as the heir of Joseph Hunter, deceased, and did not call the adverse party as a witness. The statute provides in such a case, the defendant shall not be allowed to testify.

12. Plaintiff, over the objection of defendant, testified on rebuttal to purported conversations with Mrs. Hunter, in which she claimed the latter admitted Joseph had an interest in the Shell block. This was an attempt to establish that Joseph Hunter owned a one-third interest in the property, by declaration and admissions of the trustee, was for the purpose of proving interest, and was not rebuttal evidence but belonged to plaintiff's case in chief. Plaintiff was in court and counsel offered no excuse for withholding this evidence, and the situation presented nothing appealing to the discretion of the court to admit such testimony on rebuttal. Counsel had no right to intentionally hold back affirmative evidence in chief, tending to prove interest, and introduce it in this manner without good reason therefor. *Hardesty v. People,* 52 Colo. 450, 121 Pac. 1023.

In support of a motion for a new trial, affidavits were filed setting out newly discovered evidence shortly after the trial, which was very material to defendant. If this evidence in chief, put in on rebuttal, had been introduced in its proper place, defendant might have discovered this testi-

mony in time to have introduced it on the trial. We do not reverse the case on this account, however, but simply call attention to it as a matter of improper practice. The case is reversed because of insufficient testimony to support the allegations of the complaint.

13. Space does not permit us to detail the purported conversations of the plaintiff with Mrs. Hunter. Their general trend and substance was to the effect that she had on different occasions in 1904 and 1907 told plaintiff that Joseph had an interest in the Shell block. Once she uses this language: "Mother Hunter said I was to receive my $200.00 a month the same as Joe had received it, and I should do so until the block was sold, after that I was to receive Joe's share—a one-third interest." Alleged conversations testified to by the interested party many years after they are said to have occurred, with a trustee who died before the trial, and always at a time when no one else was present, and when there was no possible way of contradicting them, are not looked upon favorably. Slight modifications in the words spoken may change the whole meaning. This class of testimony is always regarded as weak and unreliable, is viewed with suspicion and should be scrutinized with the greatest care.

In *Leroy v. Norton,* 49 Colo. 490, 113 Pac. 529, it is said: "It seems to be generally accepted that a resulting trust cannot be established upon the admissions of the alleged party alone." In *Ringo v. Richardson,* 53 Mo., it is held that verbal admissions of deceased persons as to resulting trusts should never be received except upon clear, strong, unequivocal and well corroborated testimony. To the same effect see *Freeman v. Peterson,* 45 Colo. 102, and *Van Buskirk v. Van Buskirk,* 148 Ill. 19. These alleged admissions did not corroborate that Joseph Hunter paid one-third the purchase price, because there was no such proof; they are in conflict with what Mrs. Hunter actually did in her interpretation of the trust, and in conflict with plaintiff's con-

duct, and what occurred after Joseph's death. There was evidence that Mrs. Hunter told plaintiff she should have an allowance of $100.00 per month as long as her name remained Hunter. We are aware that plaintiff denied this; but the facts are she received and accepted such an allowance for over two years after Joseph's death, without remonstrance, or any claim that she was entitled to an income or any interest in the property. She admitted that she intentionally deceived the family as to her subsequent marriage, and that she falsified in her letters. After Joseph's death, plaintiff returned to Boston in the fall of 1908, remarried in the spring of 1909, and returned to Denver where she remained during that summer. She concealed her marriage from the Hunters, passing herself off to them as Joseph's widow. She returned to Boston in the fall, coming back in November, 1909, and attending Mrs. Hunter's funeral as Joseph's widow, still concealing her marriage. The fact that she had remarried was accidentally discovered in the spring of 1910, when Mrs. Irvine wrote her that she and her husband were coming to Boston and would visit her. The correspondence which followed led to the discovery of her second marriage, and the allowance of $100.00 per month was stopped. Plaintiff then wrote a letter in which her only complaint was that she did not receive the $100.00; and although this was more than two years after Joseph's death, she made no claim of ownership in the income, or to any interest in the Shell block. Her complaint being ignored, in October, 1910, she wrote a threatening letter in which she remarks, that Joseph Hunter made all the money invested in the Hunter and Shell blocks, and for safety placed the title in his mother's name; that he had acquainted her with every detail concerning his business; that previous to his death, his mother had promised him that until the property should be sold, she should receive an income of $200.00 a month, and in the event of Mother Hunter's death she should inherit one-half of all the property standing in

her name; and that she understood such a will had been made. Judged by her conduct when the act was in the doing, she had no thought of claiming the income or a third interest in the property. For over two years she gladly accepted an allowance of $100.00 a month, practiced deception to retain it, and when it ceased, her only complaint was because she no longer received it. When she found it would not be renewed, she became abusive, claimed a half interest in all the property, and it was not until this suit was brought in July, 1911, that she changed her tactics, and claimed a one-third interest as the beneficiary of a resulting trust.

The evidence in support of plaintiff's claim should have been clear, strong, satisfactory and convincing that Joseph Hunter owned a one-third interest in the certificates, the proceeds of which paid for the Shell block.—*Whitsett v. Kershow,* 4 Colo. 419; *Lundy v. Hanson,* 16 Colo. 267, 26 Pac. 816; *McClure v. Commissioners,* 19 Colo. 122, 34 Pac. 763; *Mullen v. McKim,* 22 Colo. 468, 45 Pac. 416; *Nesmith v. Martin,* 32 Colo. 77, 75 Pac. 590; *Freeman v. Peterson,* 45 Colo. 102, 100 Pac. 600; *Leroy v. Norton,* 49 Colo. 490, 113 Pac. 529; *Bank v. Campbell,* 2 Colo. App. 271, 30 Pac. 357; *Doll v. Gifford,* 13 Colo. App. 67, 56 Pac. 676; *Keuper v. Mette,* 239 Ill. 586, 88 N. E. 218; *Metropolitan Bank v. Perry,* 259 Ill. 183, 102 N. E. 218; *Stephens v. St. Louis Co.,* 260 Ill. 364, 103 N. E. 190; *Cunningham v. Cunningham,* 125 Iowa 681, 101 N. W. 470; Pom. Eq. Jur. vol. 3, § 1040.

There is a statement in the findings of the court that the evidence was very conflicting. We have read the record carefully several times and fail to find such conflict. Lillian E. Irvine testified that the evening following the funeral of Mrs. Hunter, plaintiff asked witness if Mrs. Hunter left a will, and said she hoped that Mrs. Irvine would get the Abbott (Shell) block, that she deserved it. Amanda Matthews, the nurse, testified that after the funeral of Mrs. Hunter, plaintiff had a conversation with her in reference to the property, in which plaintiff asked if Mrs. Hunter had left

a will, and witness told her that the Hunter block had been deeded to Mr. Hunter and the Shell block to Mary; that plaintiff remarked she thought Mary ought to have it because she deserved it, it was hers. Dr. Irvine testified that defendant made a statement in the presence of himself, Mrs. Hunter and plaintiff, that Joseph on his deathbed said that his only regret was that he was leaving his wife a pauper, and that if Mary would see that she did not want for anything while her name was Hunter, he would die happy; that Mrs. Hunter then asked plaintiff if $100.00 a month would be sufficient for her needs and that plaintiff replied: "Whatever you see fit to give me, Mother." Plaintiff denied having these three conversations, and this was the only conflict in the testimony of any of the witnesses.

The judgment is reversed and the cause remanded with directions to the lower court to dismiss the bill.

*Reversed.*

Decision *en banc.*

HILL, J., and WHITE, J., dissent.

TELLER, J., not participating.

Decided July 6, A. D. 1915. Rehearing denied November 1, A. D. 1915.